Docket Nos. 106353, 106359 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

SUSAN H. LACEY, Special Adm'r of the Estate of Mary E. Lacey, Deceased, Appellee, v. THE VILLAGE OF PALATINE *et al.*, Appellants.

*Opinion filed February 20, 2009.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Plaintiff, the special administrator of the estate of decedent Mary Lacey, brought this action in the circuit court of Cook County against the Village of Glenview, the Village of Palatine, and individual police officers employed by the villages (defendants). Plaintiff's complaint alleges that defendants willfully and wantonly breached duties owed to Lacey under the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2002)). Defendants moved to dismiss plaintiff's complaint pursuant to section 2–619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2–619(a)(9) (West 2006)) on the basis that they were not enforcing the Act and, therefore, were not subject to the limitations on immunity provided in section 305 of that statute

(750 ILCS 60/305 (West 2002)). The circuit court of Cook County granted defendants' motions and dismissed the case, holding that defendants were not enforcing the Act and were, therefore, immune from liability under sections 4–102 and 4–107 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/4–102, 4–107 (West 2002)).

Plaintiff appealed and the appellate court reversed, finding that questions of material fact precluded dismissal of the case. 379 Ill. App. 3d 62. Defendants sought leave to appeal to this court pursuant to Supreme Court Rule 315 (210 Ill. 2d R. 315). We granted defendants' petitions and consolidated the appeals. We also permitted the Chiefs of Police of the Intergovernmental Risk Management Agency and the South Suburban Chiefs of Police to file a brief as *amici curiae*. 210 Ill. 2d R. 345. We now reverse the decision of the appellate court and affirm the circuit court's dismissal of plaintiff's complaint.

BACKGROUND

The decedent, Mary Lacey, began living with Steven Zirko in June 1995. Plaintiff alleges that in December of the following year, Zirko began physically and emotionally abusing Lacey. Zirko was allegedly arrested on several occasions both for domestic battery and for violating various orders of protection that Lacey received between December 2002 and December 2003.

On December 9, 2003, Lacey received a two-year plenary order of protection (order) against Zirko. This order was to be in effect until December 9, 2005. It was, therefore, in full force and effect during all times relevant to this opinion. The order prohibited Zirko from physically abusing, harassing, or interfering with Lacey's personal liberty. The order also required Zirko to stay away from Lacey. The order was, pursuant to statute, entered into the Law Enforcement Automated Data System. See 750 ILCS 60/302(a) (West 2002). As a result, defendant police officers, their respective departments, the villages, and other unnamed individuals had knowledge of Lacey's order.

-2-

In October 2004, Chad Larsen, Zirko's chiropractor of five years, contacted Detective Daily of the Chicago police department.[1] Larsen, whose practice was located in Palatine, contacted the Chicago police because he had heard Zirko, a Chicago resident, make a number of threatening statements toward Lacey. According to plaintiff, Larsen stated that in the several months prior, Zirko had commented to him that Lacey needed to have her legs broken and had asked Larsen if he knew anyone that Zirko could hire to break them. Shortly before Larsen contacted Daily, Zirko told Larsen that he no longer needed someone to break Lacey's legs, he needed someone to kill her. Zirko then asked Larsen if he knew anyone he could hire to kill Lacey. In early October 2004, Zirko allegedly told Larsen that Zirko's father had agreed to kill Lacey. Zirko then requested that Larsen charge Zirko's credit card for chiropractic services on a regular basis to "set up a pattern showing that Zirko was at the chiropractor in Palatine on certain days and times."

Based on Larsen's statements, Daily began an investigation of Zirko's alleged solicitation of someone to murder Lacey. On October 14, 2004, Daily contacted the Palatine police department, presumably because Larsen's practice was located in Palatine. Daily discussed the investigation with Detectives Bertnik and Tulley of the Palatine police department.

On October 15, 2004, Palatine police Detectives Bertnik and Kraeger went to the Wilmette police department. Lacey had lived in Wilmette from February 2002 to July 2003, when she moved to Glenview. While in Wilmette, Bertnik and Kraeger learned of Zirko's "significant history of domestic battery and violations of orders of protection." Bertnik and Kraeger were also supplied with all the police reports involving Lacey and Zirko during this period.

Following their trip to Wilmette, Bertnik and Kraeger reported their investigation to Sergeant Johnson and Detective Mazurkiewicz of the Glenview police department.

---

[1]Detective Dailey and the City of Chicago were originally named as defendants in this case. Plaintiff subsequently dismissed her claims against these defendants.

-3-

That same day, Bertnik telephoned Lacey and told her she was in "immediate danger" and requested that she "come to the Glenview Police Department Station immediately." Lacey complied with this request and went to the Glenview police department.

At the Glenview police department, Lacey met with Bertnik and Kraeger, who informed Lacey of Zirko's alleged plot to murder her. Lacey informed Bertnik and Kraeger that Zirko was capable of hurting her and her family. During this discussion, Bertnik and Kraeger informed Lacey that Zirko would not be arrested at that time.

Following the meeting at the Glenview police department, Palatine and Glenview officers, including Mazurkiewicz, went to Lacey's Glenview home to further discuss Zirko's alleged murder plot. Plaintiff alleges that at this meeting, both Palatine and Glenview officers reiterated that Zirko would not be arrested, but assured Lacey that they would protect her by placing a 24-hour watch over her. Plaintiff alleges that this 24-hour watch was to include an officer posted outside Lacey's home when she was there, and an officer to follow Lacey when she left her house.[2]

On October 21, 2004, Bertnik interviewed Zirko. Zirko attended the interview with his attorney. Zirko's attorney told Bertnik that Zirko would not answer any questions and would not make any statements. However, the attorney did tell Bertnik that Zirko had no intention of harming Lacey or hiring anyone to harm Lacey.

Plaintiff alleges that on or about October 22, 2004, defendants closed their investigation into Zirko's murder-for-hire plot. Zirko was never detained or arrested.

Plaintiff alleges that from October 22, 2004, through December 13, 2004, Lacey called the Palatine and Glenview police departments multiple times requesting that defendants either arrest Zirko or provide the supervision and protection they promised. It is undisputed that defendants did not provide Lacey with police protection between October 22 and December 13, 2004.

---

[2]There are no facts alleged in plaintiff's complaint regarding whether defendants ever extended this protection to Lacey. Neither are there any allegations of when this protection was terminated if, in fact, it had ever begun.

-4-

Plaintiff alleges that on December 13, 2004, Zirko brutally attacked and murdered Lacey and her mother, Margaret Ballog,[3] while the two were present in Lacey's Glenview home.

Thereafter, the special administrator of Lacey's estate brought suit. Plaintiff's second amended complaint contained 76 separate counts against the various defendants.[4] However, this appeal is concerned only with those claims that were brought on behalf of Lacey's estate under the Act. Further, the defendants who are parties to the present appeal are the Village of Palatine and its employees Detective Bertnik, Detective Tulley, and Officer Kraeger (Palatine defendants) and the Village of Glenview and its employees Sergeant Johnson and Detective Mazurkiewicz (Glenview defendants).

The claims relevant to this appeal are plaintiff's allegations that Palatine defendants and Glenview defendants (collectively referred to as defendants) willfully and wantonly breached a duty owed to Lacey under the Act. Plaintiff filed two relevant counts against each of the police officer defendants. The first count alleged wrongful death under the Act. The second count was a survival claim under the Act. The factual assertions and alleged breaches are identical in both the wrongful-death and the survival counts. The counts are identical as to all the police officer defendants.

Plaintiff specifically alleges that Lacey was a member of the class of persons protected by the Act and had been "so found by virtue of the Order of Protection she obtained on December 9, 2003." Plaintiff further alleges that because Lacey was protected under the Act, she was owed a duty under the Act and that defendants willfully and

---

[3]Originally, the special administrator of Ballog's estate was also a plaintiff in this case. The circuit court dismissed Ballog's claim along with Lacey's claim. The appellate court affirmed the dismissal with regard to Ballog's estate. The appellate court's ruling with regard to Ballog is not before this court.

[4]The original defendants of the case were: the City of Chicago and its employee, Detective Dailey; the Village of Palatine and its employees, Detective Bertnik, Detective Tulley, and Officer Kraeger; the Village of Glenview and its employees Sergeant Johnson and Detective Mazurkiewicz; and Steven Zirko.

wantonly breached that duty. Plaintiff alleges that Bertnik, Tulley, and Kraeger of Palatine and Johnson and Mazurkiewicz of Glenview were aware of the order of protection, knew that Zirko was in violation of that order, had been informed of all facts necessary to take immediate action against Zirko, and had probable cause to arrest Zirko based on the information they received in October 2004. Plaintiff argues that defendants had a "duty under the [Act] to immediately use all reasonable means to prevent further abuse, harassment or exploitation, including but not limited to arresting Zirko or providing police supervision and protection." Plaintiff alleges that defendants violated this duty by:

"a) Failing to arrest Zirko in light of his violation of an order of protection;

b) Failing to detain and/or arrest Zirko despite learning of his plan to murder Mary Lacey;

c) Failing to provide police supervision and protection after learning of the Zirko plan to murder Mary Lacey, after deciding not to arrest Zirko, and after promising 24-hour surveillance and protection of Mary Lacey;

d) Failing to further investigate the murder plan;

e) Knowingly rejecting Mary Lacey's pleas for help to respond to complaints that she feared for her life;

f) Failing to arrange for Mary Lacey's transportation to a safe place when informed that Mary Lacey was in need of protection; and

g) Failing to intervene after learning that Mary Lacey was in need of protection."

Plaintiff alleges that as a direct and proximate result of this willful and wanton conduct, Lacey was murdered on December 13, 2004. Plaintiff further alleges that the villages of Palatine and Glenview are liable for the breaches of their officers.

Defendants filed separate motions to dismiss the case under section 2–619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2–619(a)(9) (West 2006)). The circuit court dismissed the case, finding that defendants had not been engaged in the enforcement of the Act and, thus, the absolute immunity provided defendants by sections 4–102 and 4–107 of the Tort Immunity Act (745 ILCS

-6-

10/4–102, 4–107 (West 2002)) controlled over the limited immunity in section 305 of the Act (750 ILCS 60/305 (West 2002)).

Plaintiff appealed the dismissal arguing that section 305 of the Act trumps the absolute immunity of sections 4–102 and 4–107. The appellate court reversed, holding that material questions of fact precluded dismissal under section 2–619(a)(9). In doing so, the appellate court noted that Lacey was a protected person under the Act and that, as a result, the Act imposed specific duties on defendants.

The disputed material facts identified by the appellate court included whether defendants had probable cause to arrest Zirko, whether defendants adequately investigated the murder-for-hire scheme, whether Lacey called defendants on the day of her murder, and whether defendants were enforcing the Act during the investigation and/or at the time of the murder. 379 Ill. App. 3d 62.

QUESTION PRESENTED

Despite the complex procedural history of this case, the question before this court is relatively straightforward. Defendants assert that the appellate court erred in reinstating plaintiff's claim, because they were not enforcing the Act and, therefore, enjoy blanket immunity under sections 4–102 and 4–107 of the Tort Immunity Act (745 ILCS 10/4–102, 4–107 (West 2002)).

Plaintiff counters that she has alleged facts that implicate the Act and demonstrate that defendants were enforcing the Act. Plaintiff further alleges that defendants owed a duty to Lacey under the Act and that this duty was willfully and wantonly breached. Plaintiff notes that where the Act is being enforced, the limited immunity found in section 305 of the Act controls over the absolute immunity found in sections 4–102 and 4–107 of the Tort Immunity Act. Therefore, plaintiff argues that the appellate court should be affirmed and the case remanded to the circuit court for further proceedings.

All parties agree that if the Act was not being enforced, defendants enjoy absolute immunity and the case was properly dismissed. Therefore, as defendants made clear at oral argument, the question in this case is not whether the immunity of sections 4–102 and 4–107 applies over the limited immunity of the Act, but whether the Act is implicated in the first instance.

## STANDARD OF REVIEW

This case comes to us following the circuit court's granting defendants' section 2–619(a)(9) motions to dismiss. See 379 Ill. App. 3d at 64. We review the dismissal of a complaint pursuant to section 2–619(a)(9) *de novo*. *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999).

However, we also note that this case involves interpretation of the Act. Questions of statutory interpretation are, likewise, subject to *de novo* review. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 385 (1996); *Smith v. Waukegan Park District*, 231 Ill. 2d 111 (2008).

## ANALYSIS

Ordinarily, a public entity or public employee enjoys absolute immunity for a failure to provide police protection, prevent the commission of a crime, or to make an arrest. See 745 ILCS 10/4–102, 4–107 (West 2002). Section 4–102 of the Tort Immunity Act provides:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4–102 (West 2002).

Section 4–107 further builds on this immunity by stating that "[n]either a local public entity nor a public employee is liable for an injury caused by the failure to make an arrest or by releasing a person in custody." 745 ILCS 10/4–107 (West 2002). Both sections provide defendants with absolute immunity.

However, the Illinois Constitution of 1970 established that the immunity enjoyed by public entities and employees applies only to the extent provided for by the General Assembly. See Ill. Const. 1970, art. XIII, §4; *Moore v. Green*, 219 Ill. 2d 470, 478 (2006). Thus, the General Assembly may both grant and limit the immunity of defendants. Section 305 of the Act is a grant of limited immunity to defendants.

In contrast to the grant of absolute immunity of sections 4–102 and 4–107, section 305 of the Act provides:

> "Any act of omission or commission by any law enforcement officer acting in good faith in rendering emergency assistance or otherwise enforcing this Act shall not impose civil liability upon the law enforcement officer or his or her supervisor or employer, unless the act is a result of willful or wanton misconduct." 750 ILCS 60/305 (West 2002).

In *Moore*, this court held that when the Act is implicated, the limited immunity of section 305 of the Act takes precedence over the blanket immunity of sections 4–102 and 4–107. This court specifically noted that this interpretation of the Act was consistent with the General Assembly's intention to create "a comprehensive statutory scheme for reform of the legal system's historically inadequate response to domestic violence." *Moore*, 219 Ill. 2d at 489. However, as we have noted, the question in this case is whether the Act applies in the first instance.

In order for the limited immunity provided for in section 305 to apply, the officer's act of omission or commission must occur while the officer is rendering "emergency assistance or otherwise enforcing" the Act. 750 ILCS 60/305 (West 2002). In *Calloway v. Kinkelaar*, this court noted that "the legislature unambiguously intended to limit the liability of law enforcement personnel to willful and wanton acts or omissions in enforcing the [Act]." *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 326 (1995).

In the present case, there is no claim that defendants were rendering "emergency assistance" to Lacey. Therefore, the question is whether defendants were "otherwise enforcing" the Act between October and December 2004.

The meaning of the phrase "otherwise enforcing" presents a question of statutory interpretation. The primary objective of statutory interpretation is to give effect to the intent of the legislature. *Illinois Department of Healthcare & Family Services v. Warner*, 227 Ill. 2d 223, 229 (2008). In determining the intent of the legislature, we begin with the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Michigan*

*Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). Further, a statute should be read "as a whole, considering all relevant parts." *Harshman v. DePhillips*, 218 Ill. 2d 482, 493 (2006). In addition, a court "should look to the evil that the legislature sought to remedy or the object it sought to attain in enacting the legislation." *Stern v. Northwest Mortgage, Inc.*, 179 Ill. 2d 160, 164 (1997).

The purpose of the General Assembly in enacting the Act is apparent from the face of the Act. The purposes of the Act are, in part, to:

"(1) Recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development;

\*\*\*

(3) Recognize that the legal system has ineffectively dealt with family violence in the past, allowing abusers to escape effective prosecution or financial liability, and has not adequately acknowledged the criminal nature of domestic violence; that, although many laws have changed, in practice there is still widespread failure to appropriately protect and assist victims;

(4) Support the efforts of victims of domestic violence to avoid further abuse by promptly entering and diligently enforcing court orders which prohibit abuse and, when necessary, reduce the abuser's access to the victim and address any related issues of child custody and economic support, so that victims are not trapped in abusive situations by fear of retaliation, loss of a child, financial dependence, or loss of accessible housing or services;

(5) Clarify the responsibilities and support the efforts of law enforcement officers to provide immediate, effective assistance and protection for victims of domestic violence, recognizing that law enforcement officers often become the secondary victims of domestic violence, as evidenced by the

-10-

high rates of police injuries and deaths that occur in response to domestic violence calls; and

(6) Expand the civil and criminal remedies for victims of domestic violence; including, when necessary, the remedies which effect the physical separation of the parties to prevent further abuse." 750 ILCS 60/102 (West 2002).

See also *Moore*, 219 Ill. 2d at 480-81. The Act provides that it is to be "liberally construed and applied to promote" the foregoing purposes. 750 ILCS 60/102 (West 2002).

The phrase "otherwise enforcing" is not defined by the Act. See 750 ILCS 60/103 (West 2002). Nor has the phrase ever been interpreted by this court within the context of the Act. However, the meaning of the phrase is easily comprehended when the definitions of the two terms are examined. Where a term is undefined within a statute, "[i]t is entirely appropriate to employ the dictionary as a resource to ascertain the meaning of undefined terms." *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 243 (2005).

The word "enforce" is defined as "to give force to" or to "put in force : cause to take effect : give effect to." Webster's Third New International Dictionary 751 (2002). Black's Law Dictionary further defines "enforce" as "[t]o give force or effect to (a law, etc.); to compel obedience." Black's Law Dictionary 569 (8th ed. 2004). The word "otherwise" simply means "different" or "in different circumstance : under other conditions." Webster's Third New International Dictionary 1598 (2002).

Therefore, in context, the phrase "otherwise enforcing" means that the police are giving effect to some portion of the Act under circumstances that cannot be considered an emergency.

Though this court has never been previously called on to interpret the meaning of "otherwise enforcing" within the Act, this court has had the opportunity to interpret a similar phrase in the Tort Immunity Act. Section 2–202 of the Tort Immunity Act uses similar language to section 305 of the Act. See *Moore*, 219 Ill. 2d at 489. Section 2–202 states that an officer is liable if they commit a willful and wanton act or omission "in the execution or enforcement of any law."

In interpreting section 2–202, this court has held that the determination of whether an officer was enforcing a law is a question

of fact that must be determined by the trier of fact in light of the circumstances in each case. *Aikens v. Morris*, 145 Ill. 2d 273, 286 (1991). Enforcement of the law is " 'rarely a single, discrete act, but is instead a course of conduct.' " *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211, 221 (1986), quoting *Thompson v. City of Chicago*, 108 Ill. 2d 429, 433 (1985).

By bringing all the alleged breaches within a single count, plaintiff has tried to establish that defendants were engaged in an uninterrupted course of enforcing the Act that began the moment defendants were informed of the alleged murder-for-hire plot and only ended upon Lacey's murder. Therefore, as the question has been framed in plaintiff's complaint, the issue is whether defendants were enforcing the Act at all times alleged within this time frame. For the reasons that follow, we find that defendants were not enforcing the Act at all relevant times, and the cause was properly dismissed.

Plaintiff alleges at least seven ways that defendants breached their duty to Lacey under the Act. However, before a plaintiff may recover for a breach, they must allege that the breach was related to a duty the plaintiff was owed. In *Calloway*, this court stated that an injured party can recover under the Act provided that he or she can "establish that he or she is a person in need of protection under the Act, the statutory law enforcement duties owed to him or her were breached by the willful and wanton acts or omissions of law enforcement officers, and such conduct proximately caused plaintiff's injuries." *Calloway*, 168 Ill. 2d at 324. When plaintiff's complaint is read as a whole, the duty defendants were alleged to owe Lacey was an ongoing, open-ended duty to protect Lacey from further abuse. Plaintiff alleges that this duty was breached at multiple times.

The flaw in plaintiff's claim is that the Act does not impose the kind of general, open-ended duty to protect that plaintiff alleges was breached. Implicit within the definition of "otherwise enforcing" is some police involvement or contact with a protected person or someone on his or her behalf. The Act is not implicated merely because someone is a protected party under the Act. If this court were to hold to the contrary, we would create a generalized duty by all law enforcement agencies and personnel toward anyone who has been abused by a family or household member regardless of whether the police have reason to know that their services may be required.

-12-

While the Act can require police intervention under certain circumstances (see *Moore*, 219 Ill. 2d 470; *Sneed v. Howell*, 306 Ill. App. 3d 1149 (1999); *Calloway*, 168 Ill. 2d 312), there is no generalized, open-ended duty to protect victims of domestic violence. As this court noted in *Aikens v. Morris*,

> "A police department's duty to preserve the well-being of the community is owed to the public at large, rather than specific individuals. [Citations.] The duty is so limited because of strong public policy considerations which seek to avoid placing police departments in the untenable position of guaranteeing the personal safety of each individual in the community." *Aikens v. Morris*, 145 Ill. 2d 273, 278 n.1 (1991).

Even though *Aikens* was not a case that dealt with the Act, we find persuasive its logic as to why there can be no general duty to protect.

Defendants and *amici* further underscore the impossibility of such a generalized duty to protect when they compare the number of orders of protection against the number of law enforcement officers in the state. Defendants note that there were 64,639 orders of protection issued within the State of Illinois in 2005, citing http://www.ivpa.org/factsheets/illinoisviolencefactsheet.pdf (last visited December 17, 2008). However, defendants note that, excluding the Illinois State Police, there are only 38,611 full-time police officers in the state.[5] Thus, even assuming that there is only one protected person named in each order of protection, it would be impossible for the police to provide protection to each of these persons at all times.

Further, the Act makes the necessity of police contact explicit through its delineation of law enforcement responsibilities in section 304. Section 304 of the Act requires a law enforcement officer to

---

[5]Defendants cite the "Executive Director's Office of the Local Enforcement Officer's Training Board" for this figure. This court has not been able to verify this figure. However, because the exact number is not central to this opinion, and because the parties have given us no reason to dispute this figure, we have used it to illustrate the impossibility of a general duty to protect all persons protected by the Act at all times.

"immediately use all reasonable means to prevent further abuse." 750 ILCS 60/304(a) (West 2002). The inclusion of the word "immediately" is critical to our understanding of this section. It not only implies that the officer at the scene cannot delay in implementing reasonable means, it also implies that the officer is in a position proximate to the victim that can allow the officer to take reasonable steps to prevent further abuse. In addition, each of the reasonable steps listed in section 304 indicates that the officer is in some proximity to a person protected by the Act. For instance, the Act lists, *inter alia*, the following reasonable steps: (1) the officer accompanying a victim to his or her place or residence, (2) providing the victim with information on the procedures and relief available, (3) providing a referral to a service agency, and/or (4) providing transportation to a medical facility or a place of shelter. 750 ILCS 60/304(a)(3), (a)(4), (a)(5), (a)(7) (West 2002). Each of these reasonable steps assumes that officers will, at some point, make direct in-person contact with the victim.

However, each of these reasonable steps is also of a limited duration, indicating that the Act envisioned some discrete, limited involvement by law enforcement officers and not an open-ended, general, or long-term duty to protect. In fact, even where the Act encourages officers to accompany victims to their homes to remove their belongings, the Act notes that this escort should be for a "reasonable period of time" to allow the victim an opportunity to safely remove "necessary personal belongings and possessions." 750 ILCS 60/304(a)(3) (West 2002). If the General Assembly wished for a broader interpretation, it would not have used the words "reasonable period of time" and "necessary personal belongings." This underscores the fact that the Act does not contemplate a general ongoing duty to victims of domestic violence.

Ordinarily, the determination of whether an officer was enforcing the law is a question of fact that must be determined by the trier of fact in light of the circumstances in each case. *Aikens*, 145 Ill. 2d at 286. However, a court may, as a matter of law, determine whether officers were enforcing a law when the facts alleged support only one conclusion. *Sanders v. City of Chicago*, 306 Ill. App. 3d 356, 361 (1999).

In the present case, plaintiff's complaint is facially inadequate to invoke the application of the limited immunity of the Act.

Plaintiff alleges that defendants were "enforcing" the Act over the course of approximately two months. In the present case, defendants closed their investigation of Zirko's murder-for-hire plot on or about October 22, 2004. From that date until Lacey's murder on December 13, 2004, plaintiff makes no allegation that Lacey reported any new incident or information. There was no request for an officer to come by Lacey's home to investigate or respond to any new crime or allegation of a potential crime. There was, as stated succinctly by *amici*, "nothing new."

In the calls that Lacey allegedly made between October 22 and December 13, she expressed a desire that defendants reconsider their actions and either arrest Zirko or provide the protection that they had previously promised.[6] An individual's request that police reconsider an action previously taken is not of a nature that would ordinarily require a police response. It does not constitute a call for help, for investigation, or to report any new information. A victim's subjective fear, however reasonable it may ultimately prove to have been, does not, in itself, provide the police with a basis to take action and therefore is insufficient to invoke the Act.

Even if defendants had been enforcing the Act at the point they were informed of the alleged murder-for-hire plot, at some point over the following two months, that enforcement was concluded. Were this court to hold to the contrary, we would create a situation where once officers were aware of the potential for violence, they would remain liable for the prevention of that violence for an indefinite period of time. Such a result would be contrary to the plain language of the Act.

Because there is no genuine issue of material fact with regard to defendants' enforcement of the Act, the absolute immunity of sections 4–102 and 4–107 applies and the case is dismissed.

In light of the foregoing analysis, we do not need to address the merits of the Palatine defendants' argument that they could not

---

[6]Implicit in Lacey's request for the protection defendants had previously promised is an allegation that the protection was not being provided at the time the request was made.

enforce the Act for someone who lived outside their territorial jurisdiction.

## CONCLUSION

Because defendants were not enforcing the Act, the absolute immunity of sections 4–102 and 4–107 controls in this case. Accordingly, the decision of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*