# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Fenton v. City of Chicago*, 2013 IL App (1st) 111596

---

| | |
|---|---|
| Appellate Court Caption | JAMES FENTON, Special Administrator for the Estate of Henry Fenton, Deceased, Plaintiff-Appellee, v. THE CITY OF CHICAGO, a Municipal Corporation, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-1596 |
| Filed | January 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the fatal beating inflicted on plaintiff's decedent by the son of decedent's girlfriend at the end of a night of violent arguments, including two 911 calls that led to police intervention, the judgment entered against defendant city in excess of $2 million was affirmed, since decedent was an "abused person" within the meaning of the Domestic Violence Act, testimony that defendant's police officers had probable cause to arrest the son was properly admitted, and the officers' wilful and wanton conduct in leaving the scene without arresting the son and merely ordering him to wait outside until his girlfriend could take him to another location was a proximate cause of decedent's death. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-7956; the Hon. James M. Varga, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon and Myriam Zreczny Kasper, Assistant Corporation Counsel, of counsel), and Jennifer M. Erickson Baak, Special Assistant Corporation Counsel, of Denver, Colorado, for appellant.

Michael W. Rathsack and David B. Nemeroff, both of Chicago, for appellee.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.

Justices Fitzgerald Smith and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    In this appeal, we are asked to consider whether a jury rightly held the City of Chicago (the City) liable for the actions of two of its police officers. Those officers twice responded to the 911 calls of Henry Fenton (Fenton) related to a violent argument, only to remove the agitator, Rovale Brim (Rovale), from the premises in zero-degree weather in the middle of the night, with instructions to wait outside for at least an hour before his girlfriend would give him a ride to another location. Only minutes after the officers left him on the sidewalk, a block from the scene, Rovale returned home where he beat and stabbed Fenton, his mother's boyfriend, leading to Fenton's death. After a lengthy jury trial, which notably included an expert witness who testified critically about the conduct of the officers, the jury returned a verdict in excess of $2 million. The jury's verdict also included answers to special interrogatories which substantiated its finding that the involved officers acted wilfully and wantonly in their official activities.

¶ 2    The lawsuit of plaintiff James Fenton (plaintiff), special administrator for Fenton's estate, was premised upon the Illinois Domestic Violence Act of 1986 (the Act) (750 ILCS 60/101 *et seq.* (West 2002)), on the theory that Fenton was an "abused person" and that the officers' failure to arrest Rovale was markedly inconsistent with their duties under the Act. At trial and in this court, the City argues that the Act was not applicable to these events, that its officers were not in any way wilful and wanton in the discharge of their duties and that none of their conduct could be properly described as proximately causing the unfortunate murder of Fenton. We affirm.

¶ 3                FACTUAL BACKGROUND

¶ 4    All of the events in this domestic disturbance took place after 1:30 a.m. on March 4, 2002, at a residence on the south side of Chicago, where Fenton lived with his girlfriend,

Valerie Brim (Valerie), and her 22-year-old son, Rovale. At 1:37 a.m., Fenton called 911 and requested that police come to their home, telling the operator that there was "violence *** violent things going on" involving his girlfriend's son. The operator classified the call as a "domestic disturbance," which is dubbed a very high priority response for police officers. Four minutes later, Valerie made another call regarding the same incident and, at that time, Chicago police department (CPD) officers Morgan and Roberts were dispatched, arriving approximately eight minutes later at 1:49 a.m.

¶ 5    When they arrived, the officers were confronted with an angry, drunken and boisterous Rovale, who was yelling at Valerie, while making violent, jerky movements with a bottle in his hand. Valerie was also apparently drinking. The officers managed to separate the two individuals after five minutes or so, while Fenton sat off to the side. The officers spoke with Valerie, who informed them that Rovale had been arguing with Fenton over Rovale's use of the telephone and the fact that he was unemployed. Officer Morgan asked Valerie whether they wanted Rovale to be arrested. She said that she and Fenton did not want Rovale to be arrested, but requested that he be put in his basement bedroom. Shortly thereafter, Officer Roberts escorted Rovale to his bedroom, apparently while Rovale was still in an agitated state. During this first interaction, the officers did not perform a name check on Rovale, who was a registered sex offender. Officer Roberts talked to Fenton for all of 10 seconds during the encounter, which lasted approximately 15 minutes.

¶ 6    At 2:30 a.m., Fenton again called 911. The operator sent it to dispatch, which received the call shortly thereafter, with the officers being dispatched at 2:32 a.m. Officers Roberts and Morgan arrived more than 30 minutes later, essentially to the same drama as before, with Fenton seated on some stairs and the Brims arguing in a loud and boisterous fashion. This time, Valerie told the officers that Rovale had to be removed from the residence because he had gotten into another argument with Fenton. Rovale was asked to leave the home, which he did, indicating that his girlfriend would pick him up in an hour or so and take him to her home. The outside temperature was said to be zero degrees. Officer Morgan testified that he and Officer Roberts could not drive Rovale to his girlfriend's home, which was nearly nine miles distant, and also testified that the area was too busy to allow them to wait with Rovale for his girlfriend to arrive. Officer Roberts testified that Rovale turned down his offer of a ride to the train station. Neither officer talked to Fenton, and Officer Roberts specifically denied knowing that there was a dispute between Fenton and Rovale.

¶ 7    Rovale was seen only a block away from the home as the officers left the area. Just six minutes later, Fenton made his final call, urgently telling the operator that Rovale was going to break into the home. The officers were again dispatched, only to find Fenton stabbed, beaten and unconscious from head trauma. He subsequently died. Rovale was arrested, tried and found guilty of second-degree murder. Detective Thomas Downs, who investigated the beating, learned from the officers that Rovale and Fenton had been arguing about Rovale's use of the phone and his unemployed status. Detective Downs also testified that Valerie told the officers after the second occurrence that her son and Fenton had gotten into another argument.

¶ 8                    PROCEDURAL BACKGROUND

¶ 9        Plaintiff filed suit against the City based on the conduct of its police officers, the 911 call takers and the dispatchers. In the complaint, plaintiff alleged that the officers ignored that Fenton was an abused person within the meaning of the Act. Under the Act, police are obligated to utilize "all reasonable means to prevent further abuse" if they suspect that someone has been abused. 750 ILCS 60/304(a) (West 2002). Harassment is included in the definition of abuse in the statute. 750 ILCS 60/103(1) (West 2002).

¶ 10       At trial, the two officers testified about their two interventions with the three people living in the home. Both officers testified that they were unaware of any argument between Rovale and Fenton. As stated, this testimony was severely undermined by the testimony of Detective Downs, who took statements from the officers that indicated they were informed by Valerie on the first visit that Rovale had been arguing with Fenton. On the second visit, Valerie told them that her son had to be removed from the residence because he had gotten into *another* argument with Fenton. Remarkably, each officer testified that there was not probable cause to arrest Rovale for his actions in the home, even though they asked Fenton and Valerie whether they *wanted* Rovale to be arrested, which would strongly suggest the existence of probable cause.

¶ 11       This apparent inconsistency was driven home during the testimony of Chief Deputy Dottie Davis, whom plaintiff proffered as an expert on police procedures. Davis's background also included work as a 911 call taker and as a domestic violence trainer. Prior to trial, in a motion *in limine*, the City attempted to bar Davis's testimony as it related to the issue of probable cause, among other things, on the ground that it was not a proper subject for expert testimony. The trial court denied the motion following arguments, finding as follows:

        "I think it would aid the jury of the facts, because this is what police officers do everyday, right. Normal people don't. Accountants, plumbers, janitors. We don't want them to rely on what they see on all the crime shows."

Significantly, when plaintiff's counsel asked Davis the first question related to her opinion on the issue of probable cause, the City's lawyer objected, but only as to the "foundation" of the question and did not refer back to the City's motion *in limine*. The court allowed the witness to then give her opinion that the officers had probable cause to arrest Rovale.

¶ 12       Prior to submitting the case to the jury, plaintiff dismissed the case challenging the call takers, leaving the conduct of the dispatchers and the officers in the hands of the jury. The City submitted special interrogatories designed to test the adequacy of proof on wilful and wanton misconduct against any verdict for plaintiff. The jury returned a verdict in favor of the City as to the dispatchers, but against the City as to the two officers, specifically answering the special interrogatories in a manner entirely consistent with a finding that the officers were wilfully and wantonly liable for their actions and inactions during these encounters. In a detailed posttrial hearing, the trial court denied defendant's motion for a judgment notwithstanding the jury's verdict and its motion for a new trial, leading to this timely filed appeal.

¶ 13                                    ANALYSIS

¶ 14         The City's arguments can be broken down into three discrete positions. First, the City asserts that the trial court should have entered a judgment notwithstanding the verdict (judgment *n.o.v.*) in its favor. Specifically, the City urges us to find that Fenton was not an "abused person" in the context of the Act, thereby removing any special duties under the Act, and taking it out of the sphere of liability for wilful and wanton misconduct in the execution and/or enforcement of the law. The City also argues that the trial court should have entered a judgment *n.o.v.* in its favor because the proof failed to establish that there was a supportable proximate causation nexus between the actions of its officers and the murder of Fenton, since its officers had concluded their professional duties and since Rovale's actions broke any causal chain when he came back to the scene. Finally, the City argues that it is entitled to a new trial because the trial court improperly allowed the jury to hear plaintiff's expert testify that the two officers were wilful and wanton for their failure to arrest Rovale even though they had probable cause to do so. We will examine each contention in turn, beginning with the City's challenges to the denial of its motion for a judgment *n.o.v.*, an issue which we review *de novo*. *Ries v. City of Chicago*, 242 Ill. 2d 205, 216 (2011).

¶ 15                            DOMESTIC VIOLENCE ACT

¶ 16         The Domestic Violence Act was passed by the Illinois legislature in response to a societally significant increase in injuries and deaths that stemmed from domestic disputes. See 750 ILCS 60/102 (West 2002). The studies that detail the sad statistics of potentially preventable death in domestic arguments are legion, but suffice it to say that it was long ago recognized that careful intervention by law enforcement and the judiciary has been recognized to save many lives. At trial and in this court, the City has resolutely focused on its contention that there was not sufficient information possessed by the responding officers to suggest that Fenton was an abused person as defined by the Act and, thus, the officers had no duty to Act.

¶ 17         Section 304(a) of the Act states, in pertinent part, as follows:

             "Whenever a law enforcement officer has reason to believe that a person has been abused, neglected, or exploited by a family or household member, the officer shall immediately use all reasonable means to prevent further abuse, neglect, or exploitation, including:

                 (1) Arresting the abusing, neglecting and exploiting party, where appropriate[.]" 750 ILCS 60/304(a) (West 2002).

             In addition, " 'Abuse' means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in loco parentis." 750 ILCS 60/103(1) (West 2002).

¶ 18         The City's argument does not pass judicial muster for several reasons. First, it is uncontradicted that Fenton himself called 911 on three occasions. "Domestic disturbance" was the law enforcement tag given to each call. In terms of the hoped-for effect on police response, the "DD" moniker is 1A priority call, which is second only to "officer needs

                                        -5-

assistance." Several witnesses at trial confirmed the truth of this fact, with one going as far as suggesting that inclusion of the word "violence" in the domestic disturbance dispatch to police would constitute surplusage. This is important, because the facts adduced at trial revealed that those taking the 911 calls were specifically informed of the possibility of violence, but the officers taking the dispatch were only told of a domestic disturbance. While the City would place some significance on the absence of the term "violence" in the dispatch orders, the weight of the testimony at trial belies any such argument. This, combined with Rovale's use of alcohol and his violent, jerky movements, should have alerted the officers that the situation had surpassed mere argument. Furthermore, as alluded to above, the testimony of the Detective Downs revealed that the officers had indeed been told that Fenton and Rovale had been arguing prior to each of the 911 calls.

¶ 19    In its brief, the City forcefully argues that the conduct of these officers does not legally rise to the level of wilful and wanton misconduct. Section 305 of the Act states as follows:

> "Any act of omission or commission by any law enforcement officer acting in good faith in rendering emergency assistance or otherwise enforcing this Act shall not impose civil liability upon the law enforcement officer or his or her supervisor or employer, unless the act is a result of willful or wanton misconduct." 750 ILCS 60/305 (West 2002).

See also *Jane Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 19 (finding that willful and wanton conduct is an aggravated form of negligence requiring proof that the defendant had a duty, breached its duty, and that the breach proximately caused the plaintiff's injury). In essence, the City argues that even if one concedes that Fenton was an "abused person" under the Act, the officers acted in a professional manner and in keeping with the wishes of Fenton and Valerie, who refused the offer to have Rovale arrested. While not entirely specious, this argument shrugs off a line of precedent related to wilful and wanton misconduct. Our supreme court long ago recognized a gray area between negligent conduct and wilful and wanton misconduct. See generally *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31 (1975). There is simply no requirement that plaintiff prove conduct that approaches intentional acts in order to prove wilful and wanton misconduct. Wilful and wanton misconduct, after all, is properly described as occupying that area between simple negligence and intentional wrongdoing. *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 275-76 (1994). One might, for example, be able to argue that the officers' conduct in leaving the residence after the first complaint was negligent (ignoring, for the moment, the "offer" to arrest Rovale), but failing to arrest the provocateur after being quickly summoned again is surely consistent with wilful and wanton misconduct, because the officers were in possession of a very powerful fact when they arrived the second time. Specifically, the officers knew that their efforts to get Rovale to cool down were demonstrably ineffective.

¶ 20    Failing to act under those circumstances is consistent with a segue into wilful and wanton misconduct, since the most volatile player in this domestic drama was seen to exhibit the very same behavior *after* the police intervened the first time. This conduct was exacerbated by the decision to leave Rovale on the sidewalk where he supposedly would wait patiently in the freezing weather for an hour. The officers essentially hoped that Rovale would not turn around and finish what he had started.

¶ 21    We also find it significant that Fenton himself called 911 twice, drawing the police presence at his home. (As noted, he also called as Rovale was poised to break into the home and ultimately kill Fenton.) On those first two occasions, despite being summoned by Fenton, the evidence at trial revealed that the responding officers *never* got his version of what had been simmering inside his home that prompted *his request* for emergency assistance. At least one of responding officers was, in a timely fashion, informed that the assailant was *also* arguing with Fenton and not just with Valerie, but there was no evidence that either officer ever conducted a detailed interview with him. For obvious reasons, the officers admitted that they performed an inadequate investigation.

¶ 22    That is certainly consistent with the jury finding that the officers' actions *and* inactions amounted to wilful and wanton misconduct in their handling of this domestic disturbance. As noted in the testimony of Chief Deputy Davis, the fact that somebody made the call to 911 does not automatically mean that he is the victim of abuse. Similarly, however, that fact surely does not exclude the caller from truly occupying that status. The court and the jury heard plenty of evidence to support a finding that the officers had probable cause to arrest Rovale for disturbing the peace or for harassment under the Act. When we view the totality of this evidence, which included graphic descriptions of the drunken, boisterous and unpredictable behavior of the assailant here, it is easy to defend a jury finding that the officers exhibited an utter disregard for the safety of Fenton, who wound up murdered by the man that the police escorted to the sidewalk after leaving Fenton behind for a *second* time.

¶ 23    Along the same vein, the City's argument is quite cynical when one considers the fact that it conveniently ignores that these police officers did precious little to protect Valerie, the woman that they suggest was the only one who was being harassed by the assailant. Trying to predict what an irascible, violent and drunken man will do in a domestic dispute with his mother and her boyfriend could be an uncertain enterprise, but the potential for catastrophe is greater if one does not get everyone's version of what is going on within the household. If Valerie had been the victim here, the City's argument would gain no legal purchase. Considering the fact that there were only two potential victims in the home that evening, and one of them was killed, the City leans on a rather slender reed when it tries, in a not-so-subtle fashion, to argue that the only predictable victim was Valerie, not Fenton. Under these facts, the jury was justified in its finding that the officers should have done more to protect individuals who were abused within the meaning of the Act from the rage that the officers witnessed in Rovale. Finally, it merits mention that the public policy behind this Act would not be furthered if law enforcement could escape liability by merely claiming that the assailant was acting more malevolently toward someone other than the ultimate victim. The sort of outcome that occurred here is inarguably foreseeable, a point which will be emphasized below.

¶ 24    Our holding in this specific regard finds ample support in the comments of the trial court during the hearing on defendant's posttrial motion. In that hearing, the court went to great lengths to describe the volatile nature of Rovale's observed conduct at the scene, which led the trial judge to conclude that a jury could indeed find that Fenton was a protected person under the Act.

¶ 25              PROXIMATE CAUSATION/LEAVING THE SCENE

¶ 26      The City strongly argues that any potential liability was extinguished when its officers left the scene of the disturbance after sending Rovale onto the sidewalk outside the residence. As mentioned, the officers observed him walk all of one block before leaving in their squad car. This action, according to the City, ended any legal duty that it might have possessed during the domestic disputes themselves. In making this argument, the City is really combining a duty argument with a causation argument.

¶ 27      Proximate cause is generally a question of fact to be decided by the jury. *Thompson v. Gordon*, 241 Ill. 2d 428, 438-39 (2011). In some circumstances, the trial court can decide as a matter of law that the appropriate standard has not been met and decide the issue. See *Rice v. White*, 374 Ill. App. 3d 870, 891 (2007). Here, the City argues that the trial judge should have granted a judgment in its favor because of plaintiff's alleged failure to supply the necessary causation evidence.

¶ 28      As it relates to duty, the City suggests that supreme court precedent dictates that it cannot be subjected to "generalized, open-ended duty to protect victims of domestic violence." See *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 365 (2009). While we certainly agree with the quoted language from that case, we find that the facts of *Lacey* are measurably far afield from the factual circumstances in this case, so as to render *Lacey* of no benefit to the City's arguments. The decision in *Lacey* stemmed from a lengthy domestic dispute where the decedent's ex-boyfriend was making arrangements to kill her. Palatine police learned that the ex-boyfriend had a history of harassment allegations and arrests in his background, but ultimately terminated their investigation after being reassured by his lawyer that he meant no harm. While the case was actively being investigated, Palatine police provided extensive protection to the decedent, but all of this ceased when the investigation was closed. Approximately six weeks later, the ex-boyfriend brutally killed his ex-girlfriend and her mother. In rejecting any liability on the part of the police, the court correctly noted that the plaintiff was essentially arguing that the police had an ongoing and potentially unlimited duty to provide police protection. *Id.* at 364-65. Under those circumstances, the court felt that even the most liberal construction of the Act would not require that sort of continuing duty.

¶ 29      Here, we are dealing with a timeline that is articulated in minutes, not days, weeks or months. If *Lacey* is properly described as dealing with a six-week window, the contested time period here was no more than six *minutes* long. These officers left the angry, drunken perpetrator less than a block from the scene of the confrontation, when they had twice been summoned, only moments apart, to deal with the effects of his outbursts. While it would be manifestly absurd to allow the defendant to seek legal refuge in a case where the plaintiff sought to impose liability for the failure to provide around-the-clock protection for a threat, here, all the officers had to do was arrest Rovale. A finding that the officers should have arrested Rovale is supported not only by the expert's testimony (discussed *infra*), but also by the officers' testimony that they actually asked Fenton and Valerie if they wanted Rovale to be taken into custody. That is tantamount to an admission of probable cause to arrest.

¶ 30      Despite the sad, and indeed horrific, facts of *Lacey*, those presented in this matter *sub judice* are much more consistent with the type of incidents that the Act was specifically

trying to curb. Here, the police were not dealing with a long-simmering argument; they were presented with a drunken young man arguing with his mother and her boyfriend. The officers in the instant case were not embarked upon a long investigation where they had to interview many people in different areas and attempt to discern just how legitimate the potential threat might have been. Instead, they were confronted with a volatile, domestic argument in the heat of a drunken moment, where intervention by police and removal of the antagonist were not only predictable, but such actions were suggested by the policemen themselves, who offered to arrest and remove Rovale. These circumstances, then, are quite removed from the open-ended scenario from *Lacey*.

¶ 31        In a related way, the City attempts to argue that the murderous actions of Rovale were not proximately caused by any action or inaction by the City's officers. In making this argument, the City directly argues that Rovale's returning to beat and stab Fenton was unforeseeable. Specifically, the City cites precedent for the legal premise that the "relevant inquiry *** is whether the injury *** would [be seen] as a likely result of his or her conduct." See *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004). Answered simply, the possibility that this drunken, angry young man whose conduct had twice required police intervention might return to the residence and act in a violent manner strikes us as probable and very likely, especially since the police left him on a sidewalk outside the house in zero degree weather while he was still in an agitated state of mind. If the beating had taken place the following day, week or month, the City's argument would be much more persuasive, but it must fall on deaf ears here.

¶ 32        The City points this court to an auto/pedestrian accident case in support of its proximate cause argument. In *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-61 (1999), the supreme court found testimony of proximate cause lacking where the defendant did nothing more than furnish a "condition" that made the injury possible. In that case, the defendant illegally parked his truck. Thereafter, a student from a nearby school was killed by a driver whose view of potential jaywalking pedestrians was blocked by the illegally parked vehicle. In so holding, the court noted that it was not "reasonably foreseeable that violating a 'no parking' sign at mid-block would likely result in a pedestrian's ignoring a marked crosswalk at the corner." *Id*. at 261. Thus, in *Galman*, defendant's conduct amounted only to providing a condition that made the injury possible, defeating legal cause. *Id.* at 259-60. Here, however, the City argues that *Galman* shields it from liability, because the "evidence *** was not a basis for the officers to anticipate that Rovale would break in and murder Henry." This naked assertion is made wholly in ignorance of the evidence that officers were informed of a recurrent argument between Rovale and Fenton. It also offends both common sense and the well-documented fact that domestic disputes often erupt into serious violence in a very quick fashion. This argument is also undermined by Officer Roberts' testimony that he instructed Valerie to lock the door to the home after Rovale was escorted from the premises, because he was contemplating the possibility that Rovale might return. Based on our detailed review of the record, it is plain that these officers had two very clear opportunities to effectively prevent Rovale's predictable behavior on the night in question, leading to a very easily understood proximate cause nexus in this matter.

¶ 33 EXPERT OPINION ON PROBABLE CAUSE

¶ 34 The City further contends that it is entitled to a new trial because the trial court improperly allowed Davis, plaintiff's expert witness on police procedure, to testify that the two officers had probable cause to arrest Rovale on each of the two occasions that they were called about his conduct. Specifically, the City claims that the subject of probable cause is not appropriate for expert testimony because the subject matter is within the ken of the average juror and does not involve application of any scientific principles. *Watkins v. Schmitt*, 172 Ill. 2d 193, 205-06 (1996). The City argues that probable cause is not a concept that is difficult to comprehend and the expert's opinion did not aid this jury in its search for the truth. See *McCormick v. McCormick*, 180 Ill. App. 3d 184, 205 (1988). Accordingly, the City contends that the court's instruction defining probable cause was more than sufficient to inform the jury on the topic. We review a trial court's decision to admit expert opinion for an abuse of discretion. *Van Gelderen v. Hokin*, 2011 IL App (1st) 093152, ¶ 36.

¶ 35 In response, plaintiff initially argues that defendant forfeited this issue by failing to make an appropriate objection when Davis was first asked about her opinion on probable cause during her testimony. We agree. As mentioned above, defendant had earlier filed a motion *in limine* to prevent the admission of this opinion and the court declined to grant the motion. When the witness was asked for her opinion of whether the police had probable cause to arrest Rovale during the first call, defense counsel merely objected to the "foundation" for the question. The court denied the objection. When the witness was asked essentially the same question related to the second encounter, no objection was made.

¶ 36 An objection to foundation is not sufficient to alert the trial court to the City's claim that the question is not a proper subject for an expert's opinion. See *Townsend v. Fassbinder*, 372 Ill. App. 3d 890, 906-07 (2007). We also note that the court's ruling with respect to foundation was entirely correct, inasmuch as Davis possessed the necessary qualifications and training on police procedures relative to domestic disturbances. Furthermore, Davis had reviewed the related CPD general orders and all of the reports from the underlying occurrence and the investigation into the beating of Fenton. The foundation for her opinion was well established. The City, however, harkens back to its motion *in limine* to bar Davis from expressing any opinion related to probable cause to arrest Rovale at either time that they were at the premises responding to a 911 call. During the motion hearings, the City cited various purported infirmities with the opinions being offered by Davis. None of those infirmities related to foundation for her opinion. Instead, the City objected that the witness should not be allowed to interpret the law. It also argued that the subject of probable cause and the law related to disorderly conduct were issues that the jury could easily understand without an expert's assistance. Nonetheless, a contemporaneous objection was required. *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 904 (1997). This rule is appropriate, because the party wishing to exclude evidence has the burden to properly inform the trial judge as to the specific nature of its objection to the proffered testimony. *Townsend*, 372 Ill. App. 3d at 906-07. Thus, merely objecting to foundation related to the first police visit and failing to object at all related to the second encounter falls well short of preserving the issue on appeal.

¶ 37 Furthermore, the opinion of the expert was appropriate under the unique facts and

circumstances of the case *sub judice*. As earlier alluded to above, plaintiff claimed that the officers were wilful and wanton in their failure to arrest Rovale and remove him from the premises. It is axiomatic that a police officer must have probable cause to believe that a person has committed a crime before an arrest can be made. *People v. Neal*, 2011 IL App (1st) 092814, ¶ 10. Here, plaintiff claims that the officers had probable cause to arrest Rovale for either disturbing the peace or for violation of the Act. Both of the police officers were allowed to testify that they did not believe that they had probable cause to arrest Rovale. Despite this testimony, the officers acknowledged that they essentially *offered* to arrest him, if Valerie and Fenton so desired. Given the evidence that Officers Morgan and Roberts offered to arrest a man, whom they claimed to lack probable cause to arrest, the trial court was entitled to find that the jury could benefit from an expert who could give them a better understanding of this concept than the pattern jury instruction. As the trial court found, the average individual has no prior consideration of probable cause outside what one sees on television. It also bears mentioning that the City had two defenses that revolved around the two very different forms of causation, probable cause and proximate cause. The testimony of an expert in this sort of muddled civil, but quasi-criminal, context strikes us as quite appropriate. See also *Hayter v. City of Mount Vernon*, 154 F.3d 269, 274 (5th Cir. 1998) (permitting expert opinion regarding probable cause).

¶ 38                                                      CONCLUSION

¶ 39        As stated, the evidence presented at trial permitted a finding that Fenton was an abused person within the meaning of the Act, that the officers' conduct was wilful and wanton, and that their conduct was a proximate cause of Fenton's death. We also find that the under these unique circumstances, the trial court properly permitted Davis to testify regarding probable cause to assist the jury.

¶ 40        For all of the reasons stated, the judgment of the trial court is affirmed in all respects.

¶ 41        Affirmed.