# Illinois Official Reports

## Appellate Court

---

### *Payne v. City of Chicago*, 2014 IL App (1st) 123010

---

| | |
|---|---|
| Appellate Court Caption | JARVIS PAYNE, Plaintiff-Appellant, v. THE CITY OF CHICAGO, a Municipal Corporation, Defendant-Appellee. |
| District & No. | First District, Third Division<br>Docket No. 1-12-3010 |
| Filed | July 16, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly granted to the City of Chicago based on section 4-102 of the Tort Immunity Act in an action for the injuries suffered by plaintiff when he jumped or fell out of a second-floor window after being "tased" by a police officer responding to a call for assistance with plaintiff, who was high on crack, "wigging out," and suffering hallucinations, since the police were providing a service and were afforded unqualified immunity under section 4-102. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-7442; the Hon. Kathy M. Flanagan, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Curcio Law Offices, of Chicago (Joseph R. Curcio and Tracy A. Robb, of counsel), for appellant. |
| | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Justin A. Houppert, Assistant Corporation Counsel, of counsel), for appellee. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. Presiding Justice Hyman and Justice Mason concurred in the judgment and opinion. |

## OPINION

¶ 1    Summary judgment was granted in favor of defendant City of Chicago (the City) on plaintiff's complaint, which brought a claim for common-law battery and also alleged "willful and wanton conduct." The police responded to a call for assistance by plaintiff's relatives because plaintiff was high on crack cocaine, suffering hallucinations, physically swinging around him, had broken furniture and a window, and was injured and bleeding. When the police arrived a responding sergeant used a TASER® (TASER)[1] to subdue him. Plaintiff then either fell or jumped out of the second-floor window and became a high-level paraplegic as result of the fall. The issue presented for review is whether the trial court erred when it granted summary judgment for the defendant based on its immunity under section 4-102 of the Illinois Local Governmental and Governmental Employees Tort Immunity Act (Act) for providing police protection or service (745 ILCS 10/4-102 (West 2004)), which provides blanket immunity, or whether the court should have held that section 2-202 of the Act (745 ILCS 10/2-202 (West 2004)) for execution or enforcement of the law applied instead, which contains an exception for willful and wanton conduct. We hold the court correctly determined that section 4-102 applies to the facts of this case, as the police were providing a service and were not engaged in the execution or enforcement of any law at the time of the incident.

¶ 2                                    BACKGROUND
¶ 3    On November 1, 2004, the date of the incident in this case, plaintiff, Jarvis Payne, was living upstairs in his mother's house at 9128 S. Ellis in Chicago, Illinois. Several other family members, including his brother Eddie Payne and niece Virtira Bradshaw, also lived in the

---

[1]The trademark name "TASER" is an acronym for "Thomas A. Swift's Electric Rifle," based on a novel (Victor Appleton, Tom Swift and His Electric Rifle (1911)) where the lead character invented an electric rifle which fired bolts of electricity. According to the manufacturer, Taser International, TASER is spelled in all capital letters.

house. Plaintiff was 48 years old, 5 feet 11 inches tall, weighed between 184 and 190 pounds, and was muscular. Plaintiff had been regularly using crack cocaine since the 1980s. In November 2004, plaintiff was using it approximately twice a week. On the afternoon of November 1, 2004, plaintiff bought crack cocaine, returned to his mother's house, locked the door to his room, removed his clothes, smoked the crack, and began watching a pornographic movie. Plaintiff began to hallucinate that he was being attacked by assailants with a handgun and shotgun, and he began beating against the window of his room and yelling for help.

¶ 4    Sometime after 2 p.m., Bradshaw was downstairs with her young son when she heard the sound of plaintiff knocking over furniture upstairs. Bradshaw heard the noises were coming from inside plaintiff's bedroom upstairs and went upstairs but determined his door was locked. Bradshaw requested the help of plaintiff's brother Eddie, who was in his room across the hall from plaintiff's bedroom. Bradshaw and Eddie forced plaintiff's door open and found plaintiff naked, holding a window blind like "a machine gun," and yelling, "They coming to get me. They coming at me." Eddie suggested they leave plaintiff alone until he calmed down. Bradshaw went back downstairs and, after approximately 15 minutes, she heard glass breaking upstairs. She returned upstairs and again went with Eddie to plaintiff's room. They saw that plaintiff had smashed the glass in the window of his room and had begun destroying the furniture, television, and computer. They also saw that plaintiff's arms were bleeding profusely and he had splattered blood on the walls. Plaintiff was trying to break out the rest of the glass in the window with a chair. He began swinging the chair and then threw it and other objects around the room and out the window. Plaintiff repeatedly said, "Help, they're coming to get me," and then began "hollering" for the police to come help him. Bradshaw went downstairs and made a 911 call at 2:54 p.m. requesting an ambulance to their home because plaintiff was bleeding. Bradshaw told the dispatcher that plaintiff was high on drugs, "tearing up [her] whole house," "wigging out," and needing medical attention. Bradshaw then called Katrina Cavanaugh, who lived across the street, and asked her to come help. Cavanaugh went upstairs with Eddie while Bradshaw remained downstairs.

¶ 5    Pursuant to the call for emergency services, the Chicago police department and the Chicago fire department were both dispatched to send police officers and firemen to render assistance. Chicago fire department personnel arrived on the scene first and went upstairs to plaintiff's room. Eddie warned them that they should be careful because plaintiff had martial arts training. After receiving this warning and seeing plaintiff's condition, they chose to wait for the police. When the paramedics arrived and saw plaintiff's condition, they did not feel able to attempt to treat him until the police arrived to subdue him.

¶ 6    Michael Concannon was a battalion chief of the Chicago fire department on the date of the incident, which is the highest nonappointment rank. Concannon responded to the call for assistance. Concannon testified that plaintiff was "nude, loud, throwing things out the window, acting irrational." Plaintiff had his head out the window and his foot was out the window, straddling the window like he was "mounting a horse," and plaintiff did this several times. When Concannon arrived on the scene, another fire department truck and a basic life support (BLS) ambulance were already on the scene, but Concannon called for an advanced life support (ALS) ambulance that would be equipped to deal with a life trauma situation, "if [plaintiff] jumped." Concannon "thought [plaintiff] was going to jump" because, in Concannon's 38 years of experience, plaintiff's behavior was highly indicative of someone planning to jump. There were seven firefighters in total, five from the other fire truck, and

two emergency medical technicians (EMTs) assigned to the ambulance. Concannon ordered the fire department personnel and the EMTs to leave the house until the police had plaintiff under control because the fire department personnel were not trained in negotiating with "suicid[al] people" or "jumpers" and Concannon did not want any personnel to contribute to antagonizing plaintiff. Concannon testified that only a few minutes passed before plaintiff jumped out of the window. That time, plaintiff did not straddle the window but just jumped out. Concannon testified that plaintiff took a "powerful jump" out the window. Concannon saw that plaintiff was a couple feet back from the window and that plaintiff ran up to the window and jumped. Concannon then saw plaintiff hit the front "stoops" on the side of the stairs in front of the building and bounce off and land in the front yard. Plaintiff was immediately taken in the ALS ambulance to the hospital.

¶ 7        Officer Travelle Stewart was the first police officer on the scene. Officer Stewart went upstairs and spoke with the Chicago fire department personnel and Eddie. The fire department personnel told Officer Stewart that plaintiff was not responsive to oral directions. Eddie also told Officer Stewart that plaintiff had a black belt in karate. Officer Stewart called for backup units and a supervisor. After dispatch confirmed that Sergeant Dwayne Betts would be responding, Officer Stewart requested that Sergeant Betts bring a TASER gun. A TASER is an electroshock weapon manufactured and sold by Taser International. It uses electrical current to disrupt voluntary control of muscles, causing neuromuscular incapacitation. It is used not to inflict pain but to incapacitate an individual.

¶ 8        Sergeant Betts arrived on the scene at 3:18 p.m. and observed plaintiff perched in the upstairs window and yelling unintelligible things from the upstairs window. Sergeant Betts went upstairs and briefly spoke with the officers. Stewart testified he spoke with Sergeant Betts for no more than 30 seconds regarding the situation when Betts arrived on the scene. Officer Stewart told him that plaintiff was acting "crazy," was unresponsive, had a "third-degree black belt," was naked, and had made comments "about killing himself." The officers decided that they would need to enter the bedroom and physically remove plaintiff.

¶ 9        Sergeant Betts proceeded into plaintiff's bedroom with three officers following behind him. According to the officers on the scene, plaintiff was standing between one to four feet from the broken window at the time. Sergeant Betts addressed plaintiff when he walked into the room and said, "get down," "police," and "I'm going to TASER you," but plaintiff did not respond. Sergeant Betts then yelled, "TASER, TASER, TASER," and fired his TASER at plaintiff. Sergeant Betts and Officer Stewart both testified that they saw a "sparkly" electrical discharge from the TASER, which indicated that the TASER did not deploy effectively. The officers' testimony was that, instead of falling to the ground immobilized, plaintiff turned and leaped out the window. Officer Stewart testified that he believed he saw one of the prongs hit plaintiff on his left side and then plaintiff turned toward the officers and "got into like an Incredible Hulk-type move. And I thought I saw him pull the prongs out and he dove out the window." As plaintiff went through the window, Sergeant Betts and Officer Stewart attempted unsuccessfully to grab plaintiff's foot and Sergeant Betts cut his hand. Plaintiff landed first on a concrete stoop in front of the house and then rolled into the grass in the front yard. Approximately three minutes elapsed between the time Sergeant Betts arrived and the time plaintiff jumped or fell out the window.

¶ 10       Sergeant Betts testified he is trained in the use of a TASER. This incident with plaintiff is the only time he has fired a TASER in the field. He testified he was aware that there are

police department general orders regarding the handling of mentally disturbed persons and suicidal individuals but could not recall what those orders stated. Sergeant Betts testified he saw plaintiff "perched" in the second-floor window as he approached the house and heard plaintiff saying unintelligible things. When asked if he already decided to use the TASER, Sergeant Betts testified, "When I walked in that room armed with the TASER I felt confident that this device would bring a swift, safe end to this disturbance, so yes." Sergeant Betts testified, however, that the TASER misfired and he did not see the prongs deploy at all. Plaintiff then physically turned in his direction, clasped his hands tightly, yelled something he could not understand and turned back toward the window. Sergeant Betts testified that plaintiff's hands and arms were extended outward, parallel to one another, like "Superman," and he jumped out the window.

¶ 11      While the police were upstairs, Bradshaw saw the base of a chair fall out the front second-floor window into the front yard. She heard a female voice scream, "Agh." Bradshaw ran to the front of the house and saw the plaintiff facedown on the ground in the front yard. Bradshaw testified that the relatives who witnessed the incident told her plaintiff was leaning out the window and Sergeant Betts strode in, tasered him and made him fall out the window.

¶ 12      Cavanaugh remained in the bedroom when the police came and witnessed the incident. Cavanaugh testified that plaintiff did not jump out the window after Sergeant Betts fired the TASER. Cavanaugh testified that, rather, plaintiff was standing within inches of the window looking out and yelling out the window. Plaintiff was pulling his head back inside when the TASER struck him and that the impact from the TASER forced plaintiff out the window. Cavanaugh testified that plaintiff never threatened any of the firefighters, paramedics, and police officers in the room. Cavanaugh suggested to the officers that they get a sheet to wrap plaintiff to restrain him. Cavanaugh saw Sergeant Betts arrive, holding a TASER. As Betts was proceeding up the stairs, he was telling everyone to "move, move, move." Sergeant Betts entered the room, walked past Cavanaugh, holding the TASER, and said, "I got this." Sergeant Betts hit plaintiff with the TASER in his back. At that time, plaintiff was inches from the window. Cavanaugh testified that plaintiff did not fall but, rather, was pushed out the window by the TASER.

¶ 13      Plaintiff testified that on the date of the incident, he was trying to defend himself. He did not see faces, only weapons and he was swinging at the weapons. He did not remember being struck with a TASER. Plaintiff was high on drugs and experiencing hallucinations. He only remembered hallucinations and then feeling paralyzed and unable to stop himself as he fell through the window. When asked whether he remembered falling out the window, plaintiff testified, "the last thing I remember is, I was feeling paralyzed, and I fell through the *** window, and I hit my head." Plaintiff testified that the fall rendered plaintiff a class C5 paraplegic, which meant that he still could move his upper shoulders but was unable to use the rest of his arms or his hands and the rest of his body below his neck was paralyzed.

¶ 14      Richard Guilbault, the vice president of training and education at TASER International, testified on behalf of plaintiff by way of videotape evidence deposition that took place in Scottsdale, Arizona. Guilbault testified that the TASERS come with a warning regarding injury from falling in the use of TASERS. Guilbault testified that when individuals are hit with the probes of a TASER, "[g]enerally, they fall pretty much where they're standing." But, Guilbault testified, "there's no way to tell" how they are going to fall, and "they could possibly take a step in any direction" and "fall in any direction." Further, Guilbault testified

that a TASER would not cause neuromuscular incapacitation if the probes did not actually hit the individual or if the TASER malfunctioned. If the deployment of a TASER is not successful, sparks or "arcing" of electrical current is visible at the ends of the probes, and a popping or crackling sound is audible, which is not the case if the TASER is successfully deployed. Only ineffective deployments can be heard by persons standing near the operator of a TASER.

¶ 15    On June 25, 2010, plaintiff sued the City, alleging three separate counts for claims of battery, "willful and wanton conduct," and a claim under 42 U.S.C. § 1983. Plaintiff voluntarily dismissed the 42 U.S.C. § 1983 claim, and the City moved for summary judgment on the remaining two counts. The circuit court granted summary judgment to the City, holding that the City owed no duty pursuant to the common-law public duty rule and that the City was immune from liability under section 4-102 of the Tort Immunity Act. Plaintiff appealed.

¶ 16                                  ANALYSIS

¶ 17    Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2004). A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing ' "that there is an absence of evidence to support the nonmoving party's case." ' " *Siegel Development, LLC v. Peak Construction LLC*, 2013 IL App (1st) 111973, ¶ 109 (quoting *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

¶ 18    We note that generally an immunity conferred by the Act "is more appropriately raised in a section 2-619(a)(9) motion, which allows for dismissal when the claim asserted against the defendant is 'barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 54 (quoting 735 ILCS 5/2-619(a)(9) (West 2008)). But here the facts alleged are argued to result in two divergent inferences implicating two different provisions of the Act. "A triable issue of fact precluding summary judgment exists 'where there is a dispute as to material facts, or where, the material facts being undisputed, reasonable persons might draw different inferences from the facts.' " *Cox v. US Fitness, LLC*, 2013 IL App (1st) 122442, ¶ 9 (quoting *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 215 (2001)). "On summary judgment, if 'the defendant raises an affirmative defense and establishes his [or her] factual position with supporting documents, the plaintiff must present a factual basis arguably entitling [the plaintiff] to a judgment' ***." *Cox*, 2013 IL App (1st) 122442, ¶ 26 (quoting *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 16). See also *Evans v. Brown*, 399 Ill. App. 3d 238, 244 (2010) (stating that if the defendant establishes facts with supporting documents entitling judgment on an affirmative defense, the plaintiff must then present a factual basis arguably entitling him to a judgment).

¶ 19    When considering an appeal from a grant of summary judgment, our review is *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). See also *Pielet v. Pielet*, 2012 IL 112064, ¶ 30. *De novo* consideration means we perform the same

analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 20                         I. Reliance on Depositions Not "On File"

¶ 21    First, we address plaintiff's argument that summary judgment was inappropriately granted because the City did not properly file the depositions upon which it relied for its summary judgment motion.

¶ 22    After briefing was complete, the City submitted to the judge courtesy copies of the City's motion and reply brief along with binders containing copies of all the deposition transcripts cited. Plaintiff objected that the City had not complied with section 2-1005 which, plaintiff argued, required the filing of the depositions. The circuit court rejected plaintiff's argument and considered the City's deposition transcripts, explaining that because the City had submitted the transcripts to the court it "was able to review all of the evidence relevant to and raised by the motion and the other briefs."

¶ 23    Although section 2-1005 refers to reliance on depositions that are "on file" (735 ILCS 5/2-1005(c) (West 2004)), the filing of depositions is governed by Illinois Supreme Court Rule 207. Supreme Court Rule 207 provides the following regarding certifications and filing of depositions:

> "(a) Submission to Deponent; Changes; Signing. Unless signature is waived by the deponent, the officer shall instruct the deponent that if the testimony is transcribed the deponent will be afforded an opportunity to examine the deposition at the office of the officer or reporter, or elsewhere, by reasonable arrangement at the deponent's expense, and that corrections based on errors in reporting or transcription which the deponent desires to make will be entered upon the deposition with a statement by the deponent that the reporter erred in reporting or transcribing the answer or answers involved. *** If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. *The deposition may then be used as fully as though signed*, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.
>
> (b) Certification, Filing, and Notice of Filing.
>
> (1) If the testimony is transcribed, the officer shall certify on the deposition that the deponent was duly sworn by him and that the deposition is a true record of the testimony given by the deponent. *A deposition so certified requires no further proof of authenticity. At the request of any party*, the officer shall then securely seal the deposition, together with all exhibits, or copies thereof, in an envelope bearing the title and number of the action and marked 'Deposition(s) of (here insert name(s) of deponent(s))' and promptly file it or send it by registered or certified mail to the clerk of the court for filing." (Emphases added.) Ill. S. Ct. R. 207(b).

The Committee Comments to Rule 207(b) state:

"Paragraph (b) of this rule does away with the requirement of former Rule 19-6(5)(a) that all evidence depositions be transcribed and filed. When no party cares to have the deposition transcribed and filed, there is no reason for requiring the party taking the deposition to undergo the expense of transcription and filing. Certification, rather than certification and filing, establishes authenticity under the new provision." (Emphasis omitted.) Ill. S. Ct. R. 207(b), Committee Comments (rev. June 1, 1995).

¶ 24　　Thus, under the current amended Rule 207(b), a deposition that is certified is considered authentic and can be relied upon. In this case, the majority of depositions were certified, including the depositions of: plaintiff; Eddie Payne; Sergeant Betts; Officer Stewart; and Richard Guilbault. Plaintiff's witnesses Virtira Bradshaw and Karina Cavanaugh reserved signature for their depositions, but after an opportunity to examine the transcripts they remained unsigned for more than 28 days.

¶ 25　　There is a relative dearth of precedent analyzing the amended Rule 207(b) but we note that courts permitted exceptions even under the prior rule and allowed parties to rely on a deposition that was not filed at the time of a summary judgment hearing, for example, where plaintiff's counsel was present at the depositions, the transcripts were available to him, the transcripts were presented to the trial court, and the trial court considered them in its decision on defendant's motion for summary judgment. See *Ideal Tool & Manufacturing Co. v. One Three Six, Inc*., 289 Ill. App. 3d 773, 776-77 (1997) (citing *Schumann v. IPCO Hospital Supply Corp*., 93 Ill. App. 3d 1053, 1055-56 (1981), and *Cibis v. Hunt*, 48 Ill. App. 2d 487, 492-93 (1964)). In such instances, the trial court's reliance on the unfiled deposition transcripts was found proper. *Ideal Tool & Manufacturing Co.*, 289 Ill. App. 3d at 776-77. *Ideal Tool* relied on cases decided under the prior rule requiring the filing of depositions, before the rule was amended to allow reliance on certification. *Ideal Tool* establishes that even under prior precedent, where the transcripts were available to the opposing party and the opposing party was present, the trial court's decision to consider the depositions was allowed. Plaintiff concedes that courts also allowed the use of depositions not on file in granting summary judgment where the court found no prejudice accrued to the nonmoving party, citing to *Schumann v. IPCO Hospital Supply Corp*., 93 Ill. App. 3d 1053 (1981). Plaintiff does not argue he suffered any prejudice. Therefore, we find the court's reliance on the depositions was not an abuse of discretion and reversal of summary judgment on this basis is not warranted.

¶ 26　　　　　　　　　　　　II. Tort Immunities

¶ 27　　The City pled and relies on section 4-102 of the Act (745 ILCS 10/4-102 (West 2004)) as an affirmative defense. Section 4-102 of the Act immunizes local public entities and public employees for failure to: (1) establish a police department; (2) otherwise provide police protection; or, if police protection is provided, (3) failure to provide adequate police protection service. 745 ILCS 10/4-102 (West 2004). Section 4-102 contains no exception to immunity for willful and wanton conduct.

¶ 28　　The City also pled section 2-202 as an affirmative defense. Plaintiff claims the City did not also plead immunity under section 2-202 of the Act in its answer to the plaintiff's complaint, while the City maintains it did plead section 2-202 as an affirmative defense in its amended answer to the complaint. Our review of the City's amended answer reveals that the City pled the following as one of its affirmative defenses: "Under the Tort Immunity Act,

defendant City is not liable because 'a public employee is not liable for his or her acts or omissions in the execution or enforcement of any law, unless such acts or omissions constitute willful and wanton conduct.'" This language mirrors the language of section 2-202 of the Act, which provides: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2004). The City asserted this immunity derivatively under section 2-109 of the Act, which provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2004).

¶ 29    Thus, the City did properly plead section 2-202 of the Act also as an affirmative defense in its amended answer and plaintiff's argument is without merit. Nevertheless, the facts of this case do not establish the requisite execution or enforcement of a law but, rather, fall squarely within the "failure to provide adequate police protection service" under section 4-102.

¶ 30    Plaintiff argues that the circuit court erred in determining that section 4-102 of the Act applied to immunize the City from any liability in this case, rather than section 2-202. The City argues that the police were merely providing police service for a medical emergency, and providing police service is subject to absolute immunity under section 4-102. In *In re Chicago Flood Litigation*, 176 Ill. 2d 179 (1997), the Illinois Supreme Court made clear that if a Tort Immunity Act provision does not contain an exception for willful and wanton misconduct, then no such exception exists. See *In re Chicago Flood Litigation*, 176 Ill. 2d at 196. Section 4-102 contains no "willful and wanton" exception and thus provides blanket immunity. Section 2-202, on the other hand, does contain a "willful and wanton" exception.

¶ 31    The allegations in plaintiff's complaint of "willful and wanton misconduct" in count II[2] can defeat summary judgment only if section 2-202 of the Act applies, which contains an exception to the City's immunity for willful and wanton misconduct. The allegations of "willful and wanton misconduct" cannot, however, create any issue of material fact to defeat summary judgment if section 4-102 applies, because that section contains no exception to immunity for willful and wanton conduct.

¶ 32    Generally, the question of whether a police officer is executing and enforcing the law under section 2-202, rather than providing police protection or service under section 4-102, is a factual determination which must be made in light of the circumstances involved. "However, the question may be decided as a matter of law where the evidence is undisputed or susceptible to only one possible interpretation." *Simpson v. City of Chicago*, 233 Ill. App. 3d 791, 792 (1992). "Ordinarily, the determination of whether a public employee is enforcing a law is a question of fact that must be determined by the trier of fact in light of the circumstances in each case." *Pouk v. Village of Romeoville*, 405 Ill. App. 3d 194, 197 (2010)

___

[2]The City reads count II as attempting to allege a separate claim and argues that there is no separate claim for "willful and wanton conduct." But plaintiff maintains count II is not intended as a separate claim but, rather, "is a restatement of the battery count alleging an aggravation of the battery set out in Count I." Count II of the complaint realleged and incorporated not only the factual allegations in the complaint but all the allegations in count I for battery. This means there is no separate claim stated in count II and that it only added the allegations of willful and wanton conduct to establish the exception from the City's immunity.

- 9 -

(citing *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 367 (2009)). "However, a court may, as a matter of law, determine whether a public employee is enforcing a law when the facts alleged support only one conclusion." *Pouk*, 405 Ill. App. 3d at 197 (citing *Lacey*, 232 Ill. 2d at 367).

¶ 33 Police efforts to aid, assist, or rescue individuals are within the scope of "police protection or service" and are covered under section 4-102 of the Act. See *Anthony v. City of Chicago*, 382 Ill. App. 3d 983, 994 (2008) (providing rescue services or assistance is a function typically performed by the police that is covered by section 4-102); *Fender v. Town of Cicero*, 347 Ill. App. 3d 46, 53 (2004) (same). The phrase " 'adequate police protection or service,' " as used in section 4-102, includes "police aid, assistance, or rescue." (Emphasis omitted.) *Kavanaugh v. Midwest Club, Inc*., 164 Ill. App. 3d 213, 221 (1987). "Because these functions are commonly recognized as an important part of police services," we "believe that the legislature intended to grant immunity for this type of service as well as for police protection." *Id*. See, *e.g.*, *McElmeel v. Village of Hoffman Estates*, 359 Ill. App. 3d 824 (2005) (officer assisting a motorist in an accident and not investigating the scene, held provided police service and not enforcing or executing the law); *Fender v. Town of Cicero*, 347 Ill. App. 3d 46, 53 (2004) (alleged failure to rescue victims of a residential fire, held the officers were "serving as public safety officers at the scene of a fire" and not enforcing or executing any law).

¶ 34 Section 2-202, on the other hand, "provides immunity only where the public employee is negligent while *actually* engaged in the execution or enforcement of a law." (Emphasis in original.) *Barnett v. Zion Park District*, 171 Ill. 2d 378, 391 (1996) (citing *Arnolt v. City of Highland Park*, 52 Ill. 2d 27, 33 (1972)). "Section 4-102 immunity may apply in the context where police officers are simply 'providing [or failing to provide] police services,' but section 2-202 immunity requires more particular circumstances for its application, *i.e.*, an act or a course of conduct 'in the execution or enforcement' of law." *Aikens v. Morris*, 145 Ill. 2d 273, 282 (1991) (quoting Ill. Rev. Stat. 1979, ch. 85, ¶ 2-202). Section 2-202 does not necessarily include all activities of employee during hours of duty, but rather extends only to acts or omissions done while in actual execution or enforcement of a law. *Bruecks v. County of Lake*, 276 Ill. App. 3d 567, 568 (1995), *appeal denied*, 166 Ill. 2d 536 (1996). See, *e.g.*, *Jones v. Village of Villa Park*, 784 F. Supp. 533 (N.D. Ill. 1992) (effecting an arrest held an "execution or enforcement of any law" within Illinois immunity statute); *Bruecks*, 276 Ill. App. 3d at 569 (responding to police call that shots had been fired, held the officer "clearly was being called upon to execute or enforce a law"); *Trepachko v. Village of Westhaven*, 184 Ill. App. 3d 241 (1989) (writing a traffic ticket held executing and enforcing traffic laws); *Fitzpatrick v. City of Chicago*, 112 Ill. 2d 211, 221 (1986) (investigating a traffic accident held executing and enforcing the law); *Thompson v. City of Chicago*, 108 Ill. 2d 429 (1985) (attempting to quell a disturbance at a rock concert in a stadium, held officer was remedying a breach of the peace); *Morris v. City of Chicago*, 130 Ill. App. 3d 740 (1985) (responding to a report of a man with a gun, held responding to an actual call to enforce a law).

¶ 35 In this case, the facts are undisputed that the officers were not at plaintiff's home responding to a call that a crime may have just been committed, and they were not investigating a crime or a traffic accident, making an arrest or issuing a citation, or quelling a public breach of the peace. Rather, the officers came to plaintiff's home in response to a call for police assistance. Bradshaw told the 911 dispatcher that plaintiff was high on drugs, was "tearing up [her] whole house" and was "wigging out." Bradshaw also told the dispatcher

that plaintiff needed medical attention and also requested an ambulance to their home because plaintiff was bleeding. Both the police and the fire departments were dispatched. The police were there not to enforce or execute any law, nor to provide any medical attention (as other personnel were dispatched and on the scene), but rather to provide police assistance to subdue plaintiff for plaintiff's own safety and the safety of his family members. There was no indication that a crime was being committed; rather, the call was for assistance for safety and police protection services.

¶ 36    Plaintiff's complaint itself makes clear that section 4-102 governs. Plaintiff alleged the following, in relevant part, in his claim for battery:

"1. On or about November 1, 2004, at approximately 1:00 p.m., [plaintiff] was a resident of 9128 South Ellis Avenue, City of Chicago, County of Cook, State of Illinois.

2. At or about the aforementioned date, time and location, [plaintiff] had become confused, agitated, and was in an otherwise altered mental state.

3. That as a result of said confusion and agitation [p]laintiff's family called the Chicago Fire Department and *requested aid* in transporting plaintiff to the nearest hospital for immediate medical care and attention.

4. That pursuant to the telephone call made for emergency service the Chicago Police Department and Chicago Fire Department dispatched policemen and firemen as their duly authorized agents, servants and employees pursuant to said call *to render assistance* at the aforesaid location.

5. That the Defendants [*sic*] by its agents, servants, and employees arrived at [p]laintiff's residence and *attempted to and did intervene in attempting to render aid and care to plaintiff*.

6. That while in and upon said premises pursuant to the emergency call one of the defendant[']s agents, servants and employees tasered the [p]laintiff with a taser gun causing him to be propelled from his bedroom window to the street level of said location, a distance of approximately 30 feet.

7. That at no time, immediately before said incident did [p]laintiff threaten, provoke, or otherwise act in an aggressive manner so that Defendant[']s agents, servants and employees would or could have been in fear of their own physical well[-]being.

8. That at all times mentioned herein, before and during the *attempts by Defendant['s] agents, servants and employees to render assistance to [p]laintiff* that said Defendant by its agents, servants and employees acted in a manner utilizing force far in excess of the amount necessary or legally justified. That the use of the excessive force began *during the efforts to render aid and assistance to [p]laintiff* and continued thereafter without lawful permission or consent by [p]laintiff." (Emphases added.)

¶ 37    Thus, plaintiff's own allegations in his complaint were that the police provided a service to render assistance to plaintiff, but that it was inadequately provided, which is specifically granted immunity under section 4-102.

¶ 38    In *DeSmet v. County of Rock Island*, 219 Ill. 2d 497 (2006), the personal representative of the decedent motorist's estate brought a wrongful death and survival action against two

counties, two cities, a village, and their public employees, alleging that the defendants failed to respond to an anonymous caller's report that motorist's vehicle had left the road and had landed in a ditch. The Illinois Supreme Court held that "police protection service" under section 4-102 applied and granted tort immunity to the local public entities and their public employees for failing to provide adequate police protection service. The court specifically held that: "The statute, by its terms, immunizes local public entities and public employees from liability for failure to (1) establish a police department *or* (2) otherwise provide police protection *or* (3) if police protection service is provided, for failure to provide *adequate* police protection service." (Emphases in original.) *DeSmet*, 219 Ill. 2d at 510.

¶ 39    In *Kavanaugh*, the court affirmed the dismissal of claims that a police officer acted negligently in attempting to rescue a driver from a submerged car when the officers did not have proper equipment for the rescue. *Kavanaugh*, 164 Ill. App. 3d at 216-17. As the *Kavanaugh* court explained, "[b]ecause these functions are commonly recognized as an important part of police services, we believe that the legislature intended to grant immunity for this type of service as well as for police protection." *Kavanaugh*, 164 Ill. App. 3d at 221.

¶ 40    In *Trepachko*, this court held that section 4-102 applied to claims based on a police officer's inadequate police service in directing a vehicle across a highway while shining a blinding spotlight on the driver, causing the driver to collide with the plaintiff's vehicle. This court held that section 4-102 applied and recognized that "there is a continually growing line of jurisprudence finding that police officers are immunized from liability for acts of ordinary negligence committed when they are providing police services." (Emphasis omitted.) *Trepachko*, 184 Ill. App. 3d at 247.

¶ 41    Plaintiff concedes that "Officer Betts' intention may have been to neutralize what he perceived to be a perilous situation," but maintains that "those initial police services transmuted to an enforcement of the law at some point during the involvement at Plaintiff's home." According to the plaintiff, "the determining factor is whether Officer Betts was engaged in executing or enforcing the law at the time Plaintiff was injured." Plaintiff argues that the nature of the encounter in this case changed at the time the officers decided to use a TASER to subdue the plaintiff, and "[o]nce that plan was initiated, the officers were actively executing and enforcing the law." Plaintiff further argues that "any time a police officer employs the use of a deadly weapon, his conduct falls outside the parameters of Section 4-102 protections because the use of a weapon can only be deemed an act of executing or enforcing the law." Plaintiff concedes, however, that there is no case law which so holds.

¶ 42    Even if, for the sake of argument, the officers' conduct changed from providing a police service to executing or enforcing the law, plaintiff has not provided any argument or evidence of what law they were executing or enforcing at the time they used the TASER. The officers were called to the scene to assist in a situation where plaintiff was in a drug-induced psychotic state and posed a threat to his own safety and his family members' safety and needed to be subdued so that plaintiff could be transported for medical treatment for his bleeding wounds. The court in *Kavanaugh* rejected a similar assertion that section 2-202 applied in that case, even at the pleading stage, because "there is no evidence of what law the Oak Brook police were executing or enforcing to support this immunity defense." *Kavanaugh*, 164 Ill. App. 3d at 223. Similarly here, plaintiff has provided no evidence of what law the Chicago police officers were executing or enforcing to support his argument that section 2-202 applies.

- 12 -

¶ 43        Plaintiff also argues that section 4-102 does not apply because the City argued below that this section encompasses the police "community caretaking function," thus confusing an exception to the warrant requirement under constitutional law for search and seizure with police protection or services that are afforded state statutory immunity under our Tort Immunity Act. The City argues that the point that police "community caretaking" functions are distinguishable from their law enforcement and execution activities is valid regardless of the context of legal issues presented. We note the court in *DeSmet* made one reference to the police "community caretaking function" in discussing the difference between police services provided blanket immunity under section 4-102 and police enforcement or execution of the law under section 2-202, but did not equate "police services" with the "community caretaking function" that is part of fourth amendment jurisprudence:

> "As plaintiff acknowledges, the police in this case did not respond at all. Even if they had, they would have been providing service in the nature of a community caretaking function, not 'enforcing or executing' the law, as this court has heretofore interpreted that phrase. As we stated in *Aikens*, 'Section 4-102 immunity may apply in the context where police officers are simply "providing [or failing to provide] police services," but section 2-202 immunity requires more particular circumstances for its application, *i.e.*, an act or a course of conduct "in the execution or enforcement" of law.' *Aikens*, 145 Ill. 2d at 282. The policy considerations that support the 'common law blanket immunity, codified in section 4-102,' are 'different policy considerations' from those underlying section 2-202 of the Act. *Aikens*, 145 Ill. 2d at 282-83." *DeSmet*, 219 Ill. 2d at 520-21.

¶ 44        We need not reach the issue of whether "police services" under section 4-102's immunity under the Act is coextensive with the "community caretaking" function of police under Fourth Amendment jurisprudence to conclude that section 4-102 applies to the facts of this case. We note, however, that the similarity is rather persuasive.

¶ 45        Plaintiff also argues that the officers' actions fell outside the scope of section 4-102's blanket immunity because they exercised "control" of the scene. The City counters that the holding of *DeSmet* regarding police liability for willful and wanton conduct where an officer "exercises a degree of control" over a situation was expressly overruled in *Ries v. City of Chicago*, 242 Ill. 2d 205, 226-27 (2011). The City argues that we have recognized that *Ries* overruled the "control" holding of *DeSmet*. See *Doe v. Village of Schaumburg*, 2011 IL App (1st) 093300, ¶ 15. This is not exactly accurate. *Ries* did not overrule the "control" analysis under section 2-202, nor have we so held, as the City argues. Rather, the "control" of the scene analysis is limited to circumstances where officers are executing or enforcing the law and section 2-202 and its willful and wanton exception apply. *Ries* expressly overruled the Court's previous holding that section 2-202's willful and wanton exception could apply to other unqualified tort immunity provisions, such as section 4-102. The court again clarified in *Ries* that section 2-202's willful and wanton exception does not operate as a general willful and wanton exception to other sections of the Tort Immunity Act; rather, where other sections do not specifically provide for such an exception, there is none. *Ries* expressly overruled *Doe*'s holding that section 2-202 provided a general willful and wanton exception to the other immunity provisions in the Act. *Ries*, 242 Ill. 2d at 227. Our recognition in *Doe*, 2011 IL App (1st) 093300, was the same as the recognition of the Illinois Supreme Court in *Ries*, that the willful and wanton exception in section 2-202 is not a general exception to

other provisions in the Act that provide unqualified immunity. *Doe*, 2011 IL App (1st) 093300, ¶ 15. We explicitly stated that "[s]ection 4-102 contains no exception for willful and wanton misconduct," and that "[i]f the provision applies \*\*\*, defendants have unqualified immunity." *Id*.

¶ 46 Section 4-102, on the other hand, is a blanket immunity that contains no willful and wanton exception and, if section 4-102 is applicable, there is no special duty exception and thus no "control of the scene" analysis. The "control" analysis of officers' actions in the context of tort immunity applies only in the context of section 2-202 when an officer is enforcing or executing the law, because that section contains a "willful and wanton" exception. Analysis of "control" of the scene does not apply where an officer is not executing or enforcing the law but, rather, is providing a police service under section 4-102. It is for this reason that plaintiff's argument regarding control of the scene fails. Because we hold that section 4-102 applies and section 2-202 does not apply, we do not reach the parties' arguments as to the merits under section 2-202.

¶ 47 The City police officers were only providing a police service and, thus, the City is appropriately within the purview of section 4-102 and is appropriately afforded unqualified immunity. Plaintiff concedes that there is no willful or wanton exception from immunity under section 4-102. Therefore, the circuit court properly granted summary judgment on plaintiff's complaint.

¶ 48                                             CONCLUSION
¶ 49 We hold that the officers, in employing a TASER while responding to a call for emergency assistance to plaintiff, were providing a police service and are immune from suit under section 4-102 of the Illinois Tort Immunity Act. Therefore, we affirm the grant of summary judgment to the City.

¶ 50 Affirmed.