2026 IL App (3d) 250449

Opinion filed June 15, 2026

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| QUSAI ALKAFAWEEN, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois. |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE VILLAGE OF NEW LENOX, a | ) | |
| Municipal Corporation; JACOB KLEPK, | ) | |
| an Individual and Employee and/or Agent | ) | |
| of the Village of New Lenox; DAVID | ) | |
| DILETO, an Individual and Employee | ) | Appeal No. 3-25-0449 |
| and/or Agent of the Village of New | ) | Circuit No. 21-L-795 |
| Lenox; SILVER CROSS HOSPITAL | ) | |
| AND MEDICAL CENTERS, a | ) | |
| Corporation; DANIEL NEJAK, M.D., an | ) | |
| Individual; and DIANNE HENSEL, R.N., | ) | |
| an Individual, | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |
| | ) | The Honorable |
| (The Village of New Lenox, Jacob Klepk | ) | Daniel D. Rippy, |
| and David Dileto, Defendants-Appellees). | ) | Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court, with opinion.
Justices Holdridge and Davenport concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff, Qusai Alkafaween, filed a civil tort action against multiple defendants, including The Village of New Lenox (Village), for injuries that he suffered when he was hit by a car after New Lenox police officers dropped him off in an area unknown to him following a complaint that he was trespassing at Silver Cross Hospital and Medical Centers (referred to hereinafter as Silver Cross Hospital, Silver Cross, or the hospital) in New Lenox. The defendants that were connected to the Village (the Village itself and two of its police officers—Sergeant David Dileto and Officer Jacob Klepk) filed a motion for summary judgment, alleging that they were immune from liability under, among other things, section 4-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (745 ILCS 10/4-102 (West 2020)) because during the police encounter with plaintiff, the New Lenox police officers were providing police protection services to plaintiff. Following full briefing and a hearing on the matter, the trial court granted the New Lenox defendants' motion for summary judgment on all of plaintiff's claims against the New Lenox defendants. Plaintiff appeals. We reverse the trial court's grant of summary judgment and remand this case for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3     On December 6, 2020, shortly after midnight, plaintiff was struck by a car and severely injured while walking in the roadway on Wolf Road in Orland Park, Illinois. The incident occurred a short time after plaintiff had an encounter with New Lenox police officers at Silver Cross Hospital in New Lenox, Illinois, and had been dropped off in that area of Orland Park by a New Lenox police officer.

¶ 4     Less than a year later, in October 2021, plaintiff filed the instant civil tort action against the Village, the two New Lenox police officers that were involved in the encounter, Silver Cross

2

Hospital, and the doctor who initially treated plaintiff at the hospital. The complaint was subsequently amended.

¶ 5    In July 2024, plaintiff filed his second amended complaint, the operative pleading in this case. In the second amended complaint, plaintiff alleged claims against the Village and the two police officers (collectively referred to hereinafter as the New Lenox defendants) that were based upon willful and wanton conduct and claims against the hospital, one of the doctors, and a nurse (collectively referred to hereinafter as the Silver Cross defendants) that were based upon medical negligence. The Silver Cross defendants subsequently settled with plaintiff and are not involved in this appeal.

¶ 6    Plaintiff alleged in the second amended complaint that the New Lenox defendants had committed willful and wanton conduct in that they, with an utter indifference and conscious disregard for the safety of plaintiff, had knowingly and/or recklessly (a) devised and carried out a plan to "dump" or transport plaintiff to a location that posed a threat of imminent harm to him when Silver Cross emergency room discharge records discharged him to home (alleged as intentional conduct, rather than as knowing and/or reckless conduct); (b) failed to obtain plaintiff's address from his driver's license to transport him home consistent with the hospital's discharge instructions, even after plaintiff was captured on a police body camera attempting to hand the officers his wallet that contained his license; (c) failed to communicate with staff and other healthcare professionals at Silver Cross Hospital to obtain plaintiff's address to transport him home consistent with the hospital's discharge instructions; (d) failed to utilize the Law Enforcement Automated Data System (LEADS) to obtain plaintiff's address and transport him home consistent with the hospital's discharge instructions; (e) failed to transport plaintiff to the New Lenox Police Department, a place of safety; (f) failed to transport plaintiff to the Orland Park Police Department,

3

a place of safety; (g) failed to engage in interagency collaboration with the Orland Park Police Department to determine if the Orland Park Police Department could transport plaintiff home; (h) failed to contact superior commanding officers to assist the responding officers with devising a plan to see that plaintiff was brought to a place of safety; (i) failed to contact a New Lenox Police Department social worker to assist officers with devising a proper plan to see that plaintiff was brought to a place of safety; (j) failed to transport plaintiff to an approved mental health facility, including, but not limited to, Silver Oaks Behavioral Hospital; (k) failed to place plaintiff under civil commitment; (l) failed to choose a safe location for plaintiff; (m) failed to arrange a ride home for plaintiff; and (n) instructed plaintiff to walk down Wolf Road around midnight when officers knew the road was not a safe place for a person, let alone a person suffering a mental health crisis, to walk alone at night due to the threat of being hit by a vehicle. Plaintiff also stated or suggested in the second amended complaint that the New Lenox defendants should have taken appropriate actions instead of "dumping" or transporting plaintiff to an area that the officers knew plaintiff was unfamiliar with, that posed a threat to plaintiff's safety, and that was against hospital discharge instructions.

¶ 7     After the New Lenox defendants filed their answer and affirmative defenses and the parties conducted extensive discovery, the New Lenox defendants filed a motion for summary judgment and a supporting memorandum (collectively referred to as the motion for summary judgment or the motion) on all of the counts of the second amended complaint that applied to them. In the motion, the New Lenox defendants asserted that they were entitled to summary judgment on all of plaintiff's claims because plaintiff's claims were barred by the statutory immunity provided in section 4-102 and certain other sections of the Tort Immunity Act that provided absolute immunity for such claims. Plaintiff filed a response and opposed the motion for summary judgment. In the

4

response, plaintiff asserted that a grant of summary judgment was inappropriate because a genuine issue of material fact existed as to whether the New Lenox defendants were providing police protection services to plaintiff during the encounter, such that section 4-102 (*id.*) (absolute immunity) would apply, or were executing or enforcing the law, such that only section 2-202 (*id.* § 2-202) (limited immunity) would apply (provided immunity for simple negligence but not for willful and wanton conduct). The New Lenox defendants filed a reply to plaintiff's response and maintained their prior assertion of absolute immunity.

¶ 8 Along with fully briefing the issues related to summary judgment, the parties also submitted to the trial court numerous documents and other materials in support of their respective positions. These materials include the police body camera videos of the two New Lenox police officers, which captured the entire encounter between the police officers and plaintiff; the deposition testimonies of plaintiff, the two New Lenox police officers, a supervisor of the two officers, the doctor who initially treated plaintiff in the emergency room at the hospital, the Orland Park police officer who investigated and reconstructed the accident in which plaintiff was struck by a vehicle, and plaintiff's expert witness on police procedure and crisis intervention; the relevant New Lenox Police Department reports and written policies; the relevant hospital report from plaintiff's initial hospital treatment; and a written disciplinary letter that one of the New Lenox police officers received, relating to the encounter with plaintiff. The evidence contained in the supporting materials established the following information.

¶ 9 On December 5, 2020, shortly before 11 p.m., Dileto and Klepk of the New Lenox Police Department were dispatched to Silver Cross Hospital in New Lenox to investigate a possible criminal trespass to real property. Both officers were dressed in full police uniforms at the time, were driving their own marked squad cars, and were wearing police body cameras that recorded

5

their interactions. The dispatch indicated that an individual, who was later identified as plaintiff, had been discharged from the hospital but was refusing to leave. Dileto arrived at the hospital several minutes ahead of Klepk.

¶ 10 Upon arrival at the hospital, Dileto went into the lobby area of the emergency department. Two security guards were standing in that location in front of a smaller waiting room. Dileto approached and spoke to one of the security guards. The security guard told Dileto that plaintiff had been brought to the hospital by the Orland Park emergency medical services and the Orland Park Police Department. Plaintiff was in custody at the time for what the security guard thought was criminal trespass and was released on an individual recognizance bond. The security guard stated that the hospital treated plaintiff for a possible overdose and eventually discharged plaintiff. Plaintiff had money and an Uber or Lyft account but did not have the number for the account. The security guard told Dileto they had two different addresses for plaintiff. The Chicago Police Department proceeded to one of the addresses to try to notify the occupants that plaintiff was at the hospital, but no one was home at that location. Plaintiff told the hospital or security guards that he lived alone and had no phone or phone number.

¶ 11 After Dileto finished speaking to the security guard, he spoke to plaintiff, who had been standing in the smaller waiting room, but had moved to the entrance of the room where Dileto and the security guards were standing. Plaintiff was 24 years old. His appearance was clean, neat, and not disheveled. He was dressed in a sweater or shirt, a pair of sweatpants, some rubber slip-on shoes without socks, and a light jacket and did not appear to have a hat or gloves with him. Plaintiff had a surgical-type mask over his mouth and nose, that he eventually removed, and was carrying some papers (possibly hospital papers) in his hands.

¶ 12 Dileto used a calm, conversational tone, did not approach or put his hands on plaintiff, and asked plaintiff several questions. During the conversation, plaintiff's demeanor and behavior at times appeared to be calm and rational and at other times appeared to be erratic, agitated, and abnormal. In the calm moments, plaintiff listened to Dileto's or Klepk's questions and provided appropriate responses. In the erratic moments, plaintiff breathed in and out in a very loud and pronounced manner (possibly snarling at times), yelled loudly, made incoherent statements in a raised voice, and did not acknowledge or respond to Dileto's or Klepk's questions.

¶ 13 During the conversation, Dileto asked plaintiff multiple times where he lived, whether he lived in Chicago or Orland Park, where he wanted to go that evening, and who the officers could call to give plaintiff a ride. Plaintiff either did not answer or did not provide a rational or specific response, although the security guard gave Dileto one of the specific addresses that the hospital or the security guards had for plaintiff. Dileto told plaintiff that he wanted to know that information so that he could try to get an Uber to come get plaintiff. Plaintiff stated, "okay." After much back and forth to no avail, plaintiff indicated that he would just stay at the hospital. The security guards and Dileto told plaintiff that he could not stay there, and Dileto asked plaintiff to step outside with him and the security guards. Plaintiff did so.

¶ 14 Once outside, Dileto continued his conversation with plaintiff in front of the entrance door to the hospital. Dileto maintained the same conversational tone and did not approach or place his hands on plaintiff. As Dileto was speaking to plaintiff outside, Klepk arrived. Klepk approached the group and, at times, joined in the conversation. Like Dileto, Klepk used a calm, conversational tone, did not place his hands on plaintiff, and for the most part, did not approach plaintiff.

¶ 15 As the conversation proceeded, plaintiff continued to have both calm and erratic moments. During the erratic moments, plaintiff continued to breathe in an exaggerated fashion, yell loudly,

7

make incoherent statements in a raised voice, and not acknowledge or answer the officers' questions. Plaintiff also started laughing out loud, in one instance for no apparent reason. At one point, Klepk asked plaintiff whether he had a driver's license. Plaintiff responded affirmatively and took out his wallet but then put the wallet away without showing Klepk his license, after Klepk asked if plaintiff could take his license out of the wallet. At another point, Dileto asked plaintiff if he had any family that the officers could call to come get him. Plaintiff responded affirmatively but did not provide any information about his family members to the officers.

¶ 16     Despite Dileto's and Klepk's repeated questions, plaintiff never told the officers where he lived or where he wanted to go. At one or more times during the conversation outside, plaintiff indicated that he wanted to go back into the hospital, but Dileto told plaintiff he could not do so, and Klepk positioned himself between plaintiff and the hospital entrance. Although Dileto maintained a calm and friendly tone throughout the conversation and repeatedly assured plaintiff that the officers were trying to help him, Dileto did at one point express to one of the security guards in plaintiff's presence that he was frustrated with the Orland Park Police Department for dropping plaintiff off at the hospital in New Lenox.

¶ 17     Eventually, after the conversation between the police officers and plaintiff had gone on for about 14 minutes (both inside and outside of the hospital), plaintiff stated that he was cold and needed a car. He then began walking away from the entrance door of the hospital and toward the hospital's driveway. Dileto told plaintiff that the officers could take plaintiff part of the way to Orland Park, and plaintiff responded, "ya, that's good." The officers directed plaintiff to Klepk's squad car door, unlocked one of the rear doors, let plaintiff into the rear of the vehicle, and shut the door. The rear squad car doors could not be opened from the inside, so plaintiff could not get out of the squad car without assistance from one of the officers.

8

¶ 18    While plaintiff was in the back seat of the squad car, Dileto and Klepk stood outside the vehicle for a few moments and discussed where to take plaintiff. Dileto instructed Klepk to take plaintiff to the area of Route 6 and Wolf Road in Orland Park, where there were several businesses. Klepk was instructed to drop plaintiff off in that area and return to New Lenox. While Dileto and Klepk were talking, plaintiff yelled or screamed loudly again from inside the vehicle. After the officers decided upon Joey's Restaurant in Orland Park as an appropriate drop-off location, Klepk got into the vehicle, informed dispatch where he was going, and drove away with plaintiff in the back seat of his squad car.

¶ 19    Dileto went back into the hospital to get plaintiff's name and date of birth from the hospital staff members or the security guard. While Dileto was talking to the hospital staff members and the security guard, he again expressed his frustration that the Orland Park Police Department had dropped plaintiff off at the hospital. Dileto commented that Orland Park had to realize that the New Lenox Police Department was "not a taxi service." Dileto told the hospital staff members and the security guard that he was having one of the New Lenox officers "dump" plaintiff off at the Cook County-Will County line and that hopefully plaintiff would not "ping pong" and come back to the hospital.

¶ 20    While Dileto was inside the hospital, Klepk drove plaintiff to the location of Joey's Restaurant in Orland Park. The drive took approximately nine minutes. At one point during the drive, plaintiff again yelled or screamed loudly in the back of the squad car. At about 11:25 p.m., Klepk arrived at Joey's Restaurant, pulled into the parking lot, and stopped his vehicle. Although the area was fairly well lit, the sign on the restaurant building was not illuminated, and it appeared that the restaurant was closed.

9

¶ 21      Klepk let plaintiff out of the back of the squad car and asked plaintiff if he knew where he was going from there. Plaintiff looked around confused, responded negatively, and asked if Klepk could help him. Klepk told plaintiff that was as far as he could take plaintiff. When plaintiff again asked Klepk for help, Klepk pointed to the nearby road (Wolf Road), told plaintiff that they were in Orland Park, and instructed plaintiff that if he started walking north, there would be some businesses. Plaintiff nodded, indicating that he understood. Klepk wished plaintiff well and left in the squad car.

¶ 22      About 45 minutes later, plaintiff was struck by a vehicle while walking in the roadway on Wolf Road in the area where he had been dropped off by Officer Klepk. Plaintiff was severely injured and was taken to Silver Cross Hospital for treatment. He later testified in his deposition that he did not remember his encounter with the New Lenox police officers that evening or being hit by the vehicle. Plaintiff was ticketed by the Orland Park Police Department for walking on the roadway and later pled guilty to that offense.

¶ 23      Dileto found out later during his shift that plaintiff had been struck by a vehicle. Despite learning that information, Dileto did not add that information to his police report or notify his superior officers about what had occurred. Dileto later received a written reprimand for some aspects of his encounter with plaintiff, including the location that Dileto had selected for plaintiff to be dropped off and some of the wording that Dileto had used when speaking to the hospital staff and the security guard about plaintiff.

¶ 24      Dileto's supervisor testified in her deposition that Dileto was performing a community caretaking function or police protection service during the encounter with plaintiff when he arranged for plaintiff to be driven to Orland Park and dropped off by a New Lenox police officer.

Plaintiff's expert witness on police procedure and crisis intervention, however, testified that Dileto was executing or enforcing the law during the entire encounter.

¶ 25    In June 2025, a hearing was held in the trial court on the New Lenox defendants' motion for summary judgment. After listening to the oral arguments of the attorneys, the trial court took the matter under advisement. Approximately two months later, in August 2025, the trial court issued its ruling granting the New Lenox defendants' motion for summary judgment. When explaining its decision, the trial court stated that although the New Lenox police officers had been dispatched to the hospital to execute or enforce the law with regard to a possible criminal trespass, the encounter had transitioned to a community caretaking function when the officers provided plaintiff a ride to Orland Park, which plaintiff voluntarily chose to accept. The trial court concluded, therefore, that the New Lenox defendants were entitled to absolute immunity under section 4-102 of the Tort Immunity Act and that all of plaintiff's claims against the New Lenox defendants were barred. Plaintiff appealed.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, plaintiff argues that the trial court erred in finding that the New Lenox defendants had absolute immunity under section 4-102 of the Tort Immunity Act for plaintiff's tort claims and in granting the New Lenox defendants' motion for summary judgment on those claims on that basis. Plaintiff asserts that the summary judgment motion should not have been granted because a genuine issue of material fact exists in this case as to whether the New Lenox police officers were providing police protection services during their encounter with plaintiff, so as to trigger the absolute immunity provided under section 4-102 of the Act or whether the police officers were executing or enforcing the law during the encounter, which would trigger only the limited immunity provided under section 2-202 of the Act, with no immunity for willful and

11

wanton conduct. According to plaintiff, a trier of fact could certainly find, based upon the evidence presented in the summary judgment supporting materials, that the New Lenox police officers were executing and enforcing the criminal trespass provisions when they took plaintiff away from the trespass location (Silver Cross Hospital) and "dumped" plaintiff back off in Orland Park, in an area that was unfamiliar to plaintiff. Such conduct, plaintiff maintains, had nothing to do with aiding, assisting, or protecting plaintiff, a person the officers knew was experiencing a mental health crisis. Because of the alleged existence of a genuine issue of material fact, plaintiff asks that we reverse the trial court's grant of the New Lenox defendants' motion for summary judgment and that we remand this case for further proceedings on plaintiff's claims against the New Lenox defendants (counts I, II, and III of the second amended complaint).

¶ 28    The New Lenox defendants argue that the trial court's ruling was proper and should be upheld. The New Lenox defendants assert that after applying the case law and the undisputed facts in this case, the trial court correctly found that the New Lenox police officers' conduct fell squarely within the scope of section 4-102 of the Act. Although the police officers were initially dispatched to investigate a possible criminal trespass, the officers quickly pivoted to providing police protection or community caretaking services once it became apparent that plaintiff was not trespassing at the hospital. In support of that assertion, the New Lenox defendants point out that plaintiff was not at any time detained against his will, taken into custody, arrested, searched, or handcuffed by the New Lenox police officers. Instead, the New Lenox defendants maintain that the police officers repeatedly asked plaintiff where he lived, where he wanted to go, and if they could call someone to give him a ride home; repeatedly assured plaintiff that they were trying to help him find a ride; and eventually, with plaintiff's consent, gave plaintiff a ride to the New Lenox

12

and Orland Park border. Therefore, the New Lenox defendants request that we affirm the trial court's ruling granting summary judgment for the New Lenox defendants on plaintiff's tort claims.

¶ 29      The purpose of summary judgment is not to try a question of fact, but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions on file, and affidavits, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. See 735 ILCS 5/2-1005(c) (West 2024); *Adams*, 211 Ill. 2d at 43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Id.* A trial court's grant of summary judgment is subject to a *de novo* standard of review on appeal. *Id.* When *de novo* review applies, the appellate court performs the same analysis that the trial court would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. A trial court's grant of summary judgment may be affirmed on any basis supported by the record. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 30      The trial court, in the instant case, granted the motion for summary judgment based upon the application of the Tort Immunity Act. The Tort Immunity Act governs the tort liability of local public entities and public employees. See *West v. Kirkham*, 147 Ill. 2d 1, 5 (1992). The Act adopts the general principle that local governmental units are liable in tort but limits that liability with an extensive list of immunities based on specific government functions. See *Harris v. Thompson*,

13

2012 IL 112525, ¶ 16. The Act's purpose is to protect local public entities and public employees from liability arising from the operation of government. 745 ILCS 10/1-101.1(a) (West 2020); *Harris*, 2012 IL 112525, ¶ 17. By providing immunity, the legislature sought to prevent the diversion of public funds from their intended purpose to the payment of damage claims. *Harris*, 2012 IL 112525, ¶ 17. The Act grants only immunities and defenses—it does not create any new duties but, rather, merely codifies those duties that existed at common law, to which the subsequently delineated immunities apply. *Id.*; see 745 ILCS 10/1-101.1 (West 2020). Unless an immunity provision applies, governmental units are liable in tort to the same extent as private parties. *Harris*, 2012 IL 112525, ¶ 16.

¶ 31    The specific issue in this case centers around the interaction between sections 4-102 and 2-202 of the Tort Immunity Act. Section 4-102 of the Act, the section upon which the New Lenox defendants rely and upon which the trial court based its ruling, is titled "Police protection," and provides, in pertinent part, that:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4-102 (West 2020).

¶ 32    As the language of the statute indicates, section 4-102 is broad in scope and immunizes local public entities and public employees for, among other things, failing to provide adequate police protection or service. See *Andrade v. City of Kankakee*, 2023 IL App (3d) 230035, ¶ 16; *Payne v. City of Chicago*, 2014 IL App (1st) 123010, ¶ 27. The phrases "police protection service"

14

and "police protection or service" are not defined in section 4-102 or elsewhere in the Tort Immunity Act but have been found in case law decisions to cover situations where, at the time of the conduct at issue, the police were involved in some policing function other than traditional law enforcement—such as trying to aid, assist, or rescue a person—or were involved in a community caretaking function. See, *e.g.*, *Payne*, 2014 IL App (1st) 123010, ¶ 33; *Glover v. City of Chicago*, 2023 IL App (1st) 211353, ¶ 62. Section 4-102 does not contain a willful and wanton conduct exception and thus provides absolute or blanket immunity to local public entities and public employees. *Andrade*, 2023 IL App (3d) 230035, ¶ 16; *Payne*, 2014 IL App (1st) 123010, ¶ 30. When absolute or blanket immunity applies, the claim against the local public entity and/or public employee is barred. See *Moore v. Green*, 219 Ill. 2d 470, 478 (2006).

¶ 33    Section 2-202 of the Act, on the other hand, the section upon which plaintiff relies, is titled, "Execution or enforcement of law," and provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202 (West 2020). Unlike section 4-102, section 2-202 is narrow in scope and applies only if the public employee was actually executing or enforcing the law at the time of the acts or omissions at issue. See *Andrade*, 2023 IL App (3d) 230035, ¶ 23; *Payne*, 2014 IL App (1st) 123010, ¶ 34. The phrase "in the execution or enforcement of any law" is not defined in section 2-202 or elsewhere in the Tort Immunity Act but has been found in case law decisions to apply when the public employee is engaged in a course of conduct designed to carry out or put into effect a law. See, *e.g.*, *Andrade*, 2023 IL App (3d) 230035, ¶ 23. In addition, and again unlike section 4-102, section 2-202 contains a willful and wanton conduct exception and thus provides only limited or qualified immunity to public employees. *Glover*, 2023 IL App (1st) 211353, ¶ 63.

15

¶ 34        The question of whether a police officer or other public employee was executing or enforcing the law under section 2-202 of the Act or was providing police protection or service under section 4-102 is a factual determination that must be made based upon the unique facts and circumstances of each individual case and is ordinarily a question of fact that must be resolved by the trier of fact. See *Andrade*, 2023 IL App (3d) 230035, ¶ 23; *Payne*, 2014 IL App (1st) 123010, ¶ 32. The determination may be made by the trial court as a matter of law, however, when the facts alleged or established support only one conclusion. *Andrade*, 2023 IL App (3d) 230035, ¶ 23; *Payne*, 2014 IL App (1st) 123010, ¶ 32.

¶ 35        In the present case, after reviewing plaintiff's complaint, the materials submitted in support of and in opposition to the New Lenox defendants' motion for summary judgment, and the legal principles set forth above, we conclude that a genuine issue of material fact exists as to whether Dileto and Klepk were providing police protection or services at the time of their encounter with plaintiff, such that the absolute immunity provided in section 4-102 of the Act would apply to plaintiff's tort claims against the New Lenox defendants, or were executing or enforcing the law, such that only the limited immunity provided in section 2-202 of the Act would apply to plaintiff's claims. Some of the facts established in this case support a finding that the officers were providing police protection or service during the encounter. Those facts include that the officers did not arrest, detain, or handcuff plaintiff; that the officers kept the tone of their voices calm and conversational during the entire encounter; that the officers repeatedly assured plaintiff that they were trying to help him and repeatedly asked plaintiff where he lived and who they could call to give plaintiff a ride home; that Dileto told plaintiff that the officers could give him a ride part of the way to Orland Park, and plaintiff stated, "ya, that's good"; that other than the wording of the initial dispatch, there was no indication that plaintiff was trespassing at the hospital; that plaintiff

16

agreed to leave the hospital and go outside with the police and security guard and was apparently not trespassing; and that the responding officers' supervising officer opined that the responding officers were performing a police protection service or community caretaking function when they drove plaintiff to Orland Park and dropped him off.

¶ 36 Other facts, however, suggest that the officers were executing or enforcing the law during the encounter. Those facts include that the officers were dispatched to the hospital to investigate a criminal offense; that the hospital had apparently communicated to the police department that plaintiff was trespassing, which the officers knew or would have known meant that plaintiff was refusing to leave (see 720 ILCS 5/21-3(a) (West 2020) (indicating that a person commits criminal trespass to real property when he, among other things, remains upon the property of another after being told to leave)); that when Dileto arrived, plaintiff was being monitored by security officers, not by medical staff members of the hospital; that Dileto asked plaintiff to step outside, and plaintiff complied with that request; that on more than one occasion, plaintiff indicated that he would just stay at the hospital or that he was going to go back inside the hospital; that the security guards and/or the police officers told plaintiff that he could not stay at the hospital or go back inside the hospital; that one of the officers stood in front of the hospital entrance so as to physically block plaintiff from going back into the hospital; that the officers took plaintiff to a location of their own choosing that was unfamiliar to plaintiff and that was away from the location of the possible trespass; that plaintiff had no ability to get out of the police car on his own once he got inside the vehicle; that after plaintiff left or was removed from the location, Dileto told the hospital staff members and a security guard that he was having one of the officers "dump" plaintiff off near the Will County-Cook County border and that hopefully plaintiff would not "ping pong" back to the hospital; and that plaintiff's expert witness opined that the police officers were executing or

17

enforcing the law during the entire encounter. Based upon the facts presented, a reasonable person could conclude that the officers were acting in a law enforcement capacity when they took plaintiff to Orland Park and dropped him off. Contrary to the New Lenox defendants' implied assertion, the fact that the officers did not arrest plaintiff is not dispositive of this issue. As the facts presented suggest, just as reasonably, that the officers handled the trespass complaint, in a law enforcement capacity, by choosing to remove plaintiff from the location of the trespass, rather than by arresting plaintiff. Indeed, a reasonable person could find, based upon the fact that the officers chose to "dump" plaintiff—a person who was obviously experiencing mental health issues and was dressed in only a light coat and not wearing a hat, gloves, or socks—in the parking lot of a closed business in an unfamiliar area at nearly midnight in December when they knew plaintiff did not even have a cell phone, that the officers were not conducting "community caretaking."

¶ 37        The circumstances of this case do not clearly fall into one section of the Act or the other. This is not a case, therefore, where only one conclusion can be reached from the supporting materials presented. We thus conclude that the trial court erred in granting the New Lenox defendants' motion for summary judgment on plaintiff's claims against the New Lenox defendants (counts I, II, and III of the second amended complaint). Accordingly, we reverse the trial court's ruling as to those claims and remand this case for further proceedings.

¶ 38        As a final matter, we must comment upon the New Lenox defendants' assertion in the alternative—that discretionary immunity under section 2-201 of the Act also applies to the officers' actions in this case and provides absolute immunity to the New Lenox defendants. See 745 ILCS 10/2-201 (West 2020) (providing absolute immunity for a public employee's acts or omissions while determining policy and exercising discretion, except as otherwise provided by statute); *id.* § 2-109 (providing that a local public entity cannot be held liable for an injury resulting

18

from an act or omission of its employee when the employee is not liable). Although discretionary immunity could potentially apply in this case, the supporting materials submitted in the summary judgment proceeding establish that when the officers dropped plaintiff off in Orland Park, they were either providing police protection or services, which would trigger section 4-102 of the Act, or were executing or enforcing the law, which would trigger section 2-202. Thus, those two sections more specifically apply to the facts of this case, rather than section 2-201 (discretionary immunity). See *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 234 (2007) (declining to apply discretionary immunity and supervision immunity (745 ILCS 10/3-108(a) (West 1992)) because another form of immunity directly addressed the situation that gave rise to the plaintiff's injury). We, therefore, decline to apply section 2-201 here.

¶ 39                                     III. CONCLUSION

¶ 40        For the foregoing reasons, we reverse the judgment of the circuit court of Will County and remand this case for further proceedings.

¶ 41        Reversed and remanded.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 21-L-795; the Hon. Daniel D. Rippy, Judge, presiding. |
| **Attorneys for Appellant:** | Jack Casciato, of Curcio & Casciato, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Michael D. Bersani, of Hervas, Condon & Bersani, P.C., of Itasca, for appellees. |